Bruce G. Vanyo (SBN 60134)
bruce@katten.com
Deeksha Kohli (SBN 333887)
deeksha.kohli@katten.com
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471

[Additional Counsel on Signature Page]

*Counsel for Defendant Champignon
Brands Inc. n/k/a Braxia Scientific Corp.,
Gareth Birdsall, Matthew Fish,
Stephen Brohman, and Roger McIntyre*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY N. SCHNEIDER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHAMPIGNON BRANDS INC., GARETH BIRDSALL, and MATTHEW FISH,<br><br>Defendants. | Case No. 2:21-cv-03120-JVS-KES<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S AMENDED COMPLAINT**<br><br>Judge:  Hon. James V. Selna<br>Courtroom:  10C<br>Date:  May 9, 2021<br>Time:  1:30 p.m. |

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    Braxia Scientific Corp. .............................................................. 3

    B.    Braxia's Acquisitions ................................................................ 3

    C.    Braxia's Condensed Interim Financial Statements and MD&A ..... 4

    D.    The Continuous Disclosure Review ......................................... 4

    E.    Braxia Restates Its Unaudited Interim Financial Statements ......... 5

    F.    The Complaint .......................................................................... 6

I.    THE COURT SHOULD DISMISS ON *FORUM NON CONVENIENS* GROUNDS IN FAVOR OF CANADA .......................... 6

    A.    Canada is an Adequate Alternative Forum ................................ 7

    B.    The Private Interest Factors Overwhelmingly Support Dismissal ................................................................................. 8

    C.    The Public Interest Factors Overwhelmingly Support Dismissal ................................................................................. 11

II.    PLAINTIFF FAILS TO STATE A CLAIM .................................... 12

    A.    Standard of Review ................................................................. 12

    B.    Plaintiff's Section 10(b) Claim Fails for Multiple Reasons ......... 14

        1.    The Deal Announcements and CDR Updates Were Not False or Misleading ............................................................. 14

        2.    Plaintiff Fails to Plead a Strong Inference of Scienter ....... 16

            a.    Scienter Cannot Be Inferred From the Restatement .. 16

            b.    Scienter Cannot Be Inferred from Gareth and Brohman's Resignations ............................................. 19

            c.    Applying Technical Accounting Standards is Not a Core Operation of Braxia ......................................... 21

            d.    Plaintiff Does Not Allege a Motive for Fraud ......... 21

            e.    Plaintiff Fails to Plead a Holistic Inference of Scienter ............................................................... 23

        3.    Plaintiff Has Failed to Adequately Plead Loss Causation ..24

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

i

C. Plaintiff Fails to Plead a "Scheme Liability" Claim .................... 25

D. Plaintiff's Section 20(a) Claim Fails........................................... 25

III. CONCLUSION ...................................................................................... 25

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
  994 F.2d 996 (2d Cir. 1993) ................................................................................11

*Arkansas Tchr. Ret. Sys. v. OSI Sys., Inc.*,
  No. 2:17-cv-08841, 2019 WL 2895625 (C.D. Cal. May 7, 2019) .....................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................12

*Ayco Farms, Inc. v. Ochoa*,
  862 F.3d 945 (9th Cir. 2017) .......................................................................9, 11

*Basic v. Levinson*,
  485 U.S. 224 (1988)..........................................................................................14

*Brody v. Transitional Hospitals Corp.*,
  280 F.3d 997 (9th Cir. 2002) .....................................................................14, 15

*Cheng v. Boeing Co.*,
  708 F.2d 1406 (9th Cir. 1983) ............................................................................8

*Church v. Glencore PLC*,
  No. 18-11477, 2020 WL 4382280 (D.N.J. July 31, 2020)..........................11, 12

*Cinematix, LLC v. Einthusan*,
  No. 19-cv-02749, 2020 WL 227180 (N.D. Cal. Jan. 15, 2020) .......................8, 9

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..............................................................................16

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death
  Benefits v. CSK Auto Corp.*,
  No. CV06-1503, 2007 WL 951968 (D. Ariz. Mar. 28, 2007)...........................16

*DeMarco v. DepoTech Corp.*,
  32 F. App'x 260 (9th Cir. 2002)........................................................................22

*Eastco Int'l Corp. v. Tecma Baja LLC*,
  No. 3:18-cv-0308, 2018 WL 6248549 (S.D. Cal. Nov. 29, 2018) .......................9

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

iii

*Etaliq, Inc. v. Cisco Sys., Inc.*,
    No. 11-cv-3672, 2011 WL 13220445 (C.D. Cal. July 20, 2011).............8, 11, 12

*FUNB v. Arab Afr. Int'l Bank*,
    48 F. App'x 801 (2d Cir. 2002) ........................................................................10

*Gemini Cap. Grp., Inc. v. Yap Fishing Corp.*,
    150 F.3d 1088 (9th Cir. 1998) ...........................................................................9

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83
    (2d Cir. 2007)....................................................................................................9

*Graves v. AECOM*,
    No. 16-cv-06605, 2017 WL 5502774 (C.D. Cal. June 19, 2017) .....................25

*Hessefort v. Super Micro Computer, Inc.*,
    No. 18-cv-00838, 2020 WL 1551140 (N.D. Cal. Mar. 23, 2020).....................20

*Howe v. Goldcorp Invs., Ltd.*,
    946 F.2d 944 (1st Cir. 1991)................................................................7, 10, 11

*Ibarra v. Orica U.S.A. Inc.*,
    493 F. App'x 489 (5th Cir. 2012).....................................................................12

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
    No. 16-cv-08505, 2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ....................22

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019)..............................................................16

*In re Hansen Nat. Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)............................................................21

*In re Int'l Rectifier Corp. Sec. Litig.*,
    No. 07-cv-02544, 2008 WL 4555794 (C.D. Cal. May 23, 2008) .....................17

*In re Medicis Pharm. Corp. Sec. Litig.*,
    689 F. Supp. 2d 1192 (D. Ariz. 2009).........................................................18, 23

*In re Pharmacielo Ltd. Secs. Litig.*,
    No. 20-cv-2182, 2021 WL 4459756 (C.D. Cal. Apr. 16, 2021) .......................15

*In re Rackable Sys., Inc. Sec. Litig.*,
    No. 09-cv-0222, 2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ......................21

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

iv

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ..............................................................22, 25

*In re Royal Grp. Techs. Sec. Litig.*,
   No. 04-cv-9809, 2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005) ........................7

*In re Rural Cellular Corp. Sec. Litig.*,
   No. 02-cv-4893, 2004 WL 1278725 (D. Minn. June 6, 2004) ..........................23

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ........................................................................22

*In re Soup Kitchen Int'l Inc.*,
   506 B.R. 29 (Bankr. E.D.N.Y. 2014) ...........................................................18

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) ........................................................................12

*In re Swisher Hygiene, Inc.*,
   No. 3:14-cv-2387, 2015 WL 4132157 (W.D.N.C. July 8, 2015).....................23

*In re Taleo Corp. Sec. Litig.*,
   No. 09-cv-00151, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ......................16

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020)...........................................................15

*In re Versant Object Tech. Corp.*,
   No. 98-cv-00299, 2001 WL 34065028 (N.D. Cal. Mar. 30, 2001)...................22

*Kauffman v. Natural Health Trends Corp.*,
   No. 19-cv-163, 2019 WL 7165921 (C.D. Cal. Dec. 20, 2019) .......................16

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ........................................................................24

*Lueck v. Sundstrand Corp.*,
   236 F.3d 1137 (9th Cir. 2001) ...............................................................6, 7, 10

*Mallen v. Alphatec Hldgs., Inc.*,
   861 F. Supp. 2d 1111 (S.D. Cal. 2012) ..........................................................20

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)........................................................................................14

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

v

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

*Matter of Swift Air, L.L.C.*,
   624 B.R. 694 (D. Ariz. 2020) ....................................................................17

*McGee v. Am. Oriental Bioengineering, Inc.*,
   No. 12-cv-5476, 2014 WL 12586107 (C.D. Cal. Sept. 23, 2014) .....................18

*Mendoza v. HF Foods Grp. Inc.*,
   No. 2:20-cv-02929, 2021 WL 3772850 (C.D. Cal. Aug. 25, 2021)...................14

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
   No. 19-cv-7536, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .......................25

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .....................................................13, 22, 24

*Mina v. Red Robin Int'l, Inc.*,
   No. 18-cv-9472, 2020 WL 4037163 (C.D. Cal. Mar. 3, 2020)...........................9

*Moreno v. Omnilife USA, Inc.*,
   483 F. App'x 340 (9th Cir. 2012)...................................................................7

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ......................................................................13

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
   50 F. Supp. 3d 1328 (C.D. Cal. 2014)..................................................17, 21, 24

*Oklahoma Firefighters Pension & Retirement Sys. v. Ixia*,
   No. 13-cv-08440, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .....................21

*Perrin v. SouthWest Water Co.*,
   No. 2:08-cv-7844, 2011 WL 10756419 (C.D. Cal. June 30, 2011) ..................19

*Prodanova v. H.C. Wainwright & Co., LLC*,
   No. 17-cv-07926, 2018 WL 8017791 (C.D. Cal. Dec. 11, 2018) .....................13

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) .................................................13, 21, 23

*Ramakrishna v. Besser Co.*,
   172 F. Supp. 2d 926 (E.D. Mich. 2001) ........................................................10

*Reddy v. Mediscribes, Inc.*,
   No. 19-cv-1677, 2020 WL 2220202 (C.D. Cal. Feb. 18, 2020).......................12

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

vi

*Rok v. Identiv, Inc.*,
No. 15-cv-5775, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd*,
716 F. App'x 663 (9th Cir. 2018) ...............................................................24

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ....................................................................13

*Symington v. Guillen*,
No. 15-cv-09809, 2016 WL 7486603 (C.D. Cal. June 30, 2016) ........................9

*Takata v. Riot Blockchain, Inc.*,
No. 18-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020) ...............................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...............................................................................13

*Thomas v. Shiloh Indus., Inc.*,
No. 15-cv-7449, 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017),
*reconsideration denied*, 2017 WL 2937620 (S.D.N.Y. July 7, 2017) ...............24

*Vivendi SA v. T-Mobile USA Inc.*,
586 F.3d 689 (9th Cir. 2009) ...............................................................10, 12

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018) ...................................................................12

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).....................................................16, 20, 21, 22

**Statutes**

15 U.S.C. § 78j(b)......................................................................................12

15 U.S.C. § 78u-4(b)(1)...............................................................................13

15 U.S.C. § 78u-4(b)(2)(A) .........................................................................13

**Regulations**

17 C.F.R. § 240.10b-5............................................................................12, 25

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# INTRODUCTION

This case involves two complex accounting revisions made by Defendant Champignon Brands, Inc. (n/k/a Braxia Scientific Corp., "Braxia" or the "Company"), a Canadian startup company in an emerging alternative therapeutics industry, related to several recently acquired companies. The changes, which were included in two restated filings issued in March 2021, modified Braxia's accounting for certain intellectual property and disclosed Braxia's revised determination that the acquisitions were related-party transactions.[1] Claiming, in textbook fraud by hindsight fashion, that Defendants must have known the revisions were required earlier, Lead Plaintiff Michael G. Quinn ("Plaintiff") sued for securities fraud. The Court should dismiss the case on multiple grounds.

*Forum non conveniens*. Braxia is a Canadian issuer, conducts its business in Canada, and has no SEC reporting obligations. All of the Individual Defendants are Canadian citizens and work and reside in Canada. All of the alleged misstatements were made in Canada and issued through the Canadian public filing system. All of the key witnesses, including the Defendants and the nonparties referenced in the Complaint, are based in Canada. All of the physical documentary evidence is located in Canada. Plaintiff's choice of forum is entitled to, at most, minimal deference because this is a class action and Plaintiff resides in northern Oregon, far closer to Canada than to this District. Canada provides an adequate alternative forum for the alleged claims. This Court should not expend its resources on a case with no identifiable nexus to this District and, instead, should dismiss the case on *forum non conveniens* grounds in favor of Canada.

*Falsity*. Only Braxia's interim financial statement and management discussion and analysis were restated. Nevertheless, Plaintiff alleges that

---

[1] The Individual Defendants are Gareth Birdsall ("Gareth"), Matthew Fish ("Fish"), Stephen Brohman ("Brohman"), and Roger McIntyre ("McIntyre"). Gareth and Brohman left Braxia before the restatement. Nothing in this memorandum should be construed as an admission by them that the initial accounting was incorrect or that the restatement was necessary.

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Braxia's unrelated press releases merely announcing the acquisitions and providing general updates on the Canadian regulatory review of Braxia's disclosures were misleading because they did not disclose the accounting issues which ultimately led to the restatement. Under Ninth Circuit law, however, there is no such "duty of completeness," and no further disclosure requirement existed because the press releases did not address the topics which led to the restatement.

*Scienter*. Plaintiff does not cite a single confidential witness or internal document suggesting that any Defendant knew of Braxia's alleged accounting errors when they were made. Instead, Plaintiff relies on a string of disfavored and oft-rejected theories in an attempt to allege a strong inference of scienter, none of which apply here. Plaintiff cannot rely on the restatement itself to infer scienter and cannot allege that accounting for intangible assets or related parties is obvious (the analysis is rather complex). The technical accounting treatment for the acquisitions is not a "core operation" of Braxia. Gareth resigned as CEO *before* the allegedly incorrect accounting was disclosed and Brohman resigned as CFO nearly six months after the initial corrective disclosure alleged by Plaintiff. Plaintiff's motive allegations, based largely upon stock sales by only one Defendant, rebut rather than support an inference of scienter. Thus, holistically, the most compelling inference here is that, at most, Defendants erred in applying the accounting rules.

*Loss Causation*. Plaintiff's two alleged corrective disclosures are defective. Braxia's announcement of the Canadian disclosure review in June 2020 cannot be a corrective disclosure because it was silent on the accounting issues. Similarly, Braxia's February 2021 press release announcing its intent to restate revealed nothing Plaintiff claims was misstated or omitted: the lack of recognizable intellectual property was revealed much earlier, and the "related party" was not identified until the restatement was issued the following month.

Accordingly, the Complaint should be dismissed with prejudice.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

2

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

**FACTUAL BACKGROUND**

### A.    Braxia Scientific Corp.

Braxia is a fledgling biopharmaceutical company organized under the laws of British Columbia and headquartered in Ontario, Canada, initially focusing on the development of medical foods and psychedelic medicines to treat mental illness, and the distribution of mushroom infused beverages. (¶¶ 14, 22-23.)[2][3]  It became a public company in February 2020.  (¶ 24.)  Its common stock is traded on the Canadian Stock Exchange (the "CSE"), the Frankfurt Stock Exchange, and in the U.S. on the OTC.  (¶ 14.)  Braxia's financial statements are prepared based upon International Accounting Standards ("IAS"), which are part of the International Financial Reporting Standards ("IFRS").  (¶ 46.)  Prior to and during the Class Period of March 27, 2020 to February 17, 2021 (¶ 1), Braxia repeatedly warned its investors about the novelty and experimental nature of its business and industry, disclosing that:  "[a]n investment in the Company is speculative and involves a high degree of risk," "[p]sychedelic therapy is a new and emerging industry," it "has no consumer products producing positive cash flow," it has not garnered "brand awareness" in its markets, it "has not earned profits to date," and that "[s]ignificant capital investment will be required to achieve profitable sales." (Ex. J at 10, 15; Ex. B at 2-3, 5-6.)

### B.    Braxia's Acquisitions

In March and April 2020, in an effort to expand its resources, drug pipeline and research activities, Braxia acquired four startups:  (1) Artisan Growers Ltd. ("AGL"), (2) Novo Formulations Ltd. ("Novo"), (3) Tassili Life Sciences Corp.

---

[2] All citations to "¶" are to Plaintiff's Amended Complaint filed on November 3, 2021 ("Complaint"), a copy of which is attached hereto.  All exhibit references are to the accompanying declaration of Jonathan A. Rotenberg.  All other declaration references are to the accompanying declarations of Linda Fuerst, Peter Rizakos, Gareth Birdsall, Matthew Fish, Roger McIntyre, and Stephen Brohman.

[3] Gareth founded Braxia in 2019 and served as the Company's CEO, President and Secretary until early May 2020 (¶¶ 16, 23).  Brohman served as CFO until December 2020 (¶ 18.)  In May 2020, McIntyre and Fish became CEO and President, respectively.  (¶¶ 17, 19.)

3

("Tassili") (collectively, the "Three Startups"); and (4) AltMed Capital Corp. ("AltMed") (together with the Three Startups, the "Acquired Businesses"). (¶ 25, *see* ¶¶ 29-43.)  AGL was a craft mushroom research and cultivation company (¶ 29); Novo was focused on developing new delivery systems for nutraceutical and pharmaceutical products (¶ 31); Tassili was a research and development company with a research partnership with the University of Miami (¶ 33); and AltMed operated ketamine-based treatment clinics, among other things (¶ 39).

Braxia issued press releases announcing the acquisitions after the deals were signed or closed (¶¶ 29-36, 38-43), and annexed the releases to (or conveyed the announcements in) Material Change Reports ("MCRs") it filed through SEDAR, the Canadian system on which all of Braxia's public filings were issued. (¶¶ 54 n.8, 91, 93-94, 96, 98, 100; *see* Exs. C-F, H.)

### C.    Braxia's Condensed Interim Financial Statements and MD&A

On May 29, 2020, Braxia filed its Condensed Interim Unaudited Financial Statements for the Six-Month Period Ended March 31, 2020 (the "Financial Statements") and its Management's Discussion and Analysis (the "MD&A"). (¶ 54; Exs. I-J.)  Therein, Braxia disclosed that the acquisitions of each of the Three Startups "ha[d] been accounted as a purchase of an asset," not as the acquisition of a business, and provided a value for each. (¶¶ 102-104; Ex. I at 10-11.)  Braxia also reported that each of the Three Startups had recognizable intellectual property. (¶¶ 102-104; Ex. I at 10-11.)

### D.    The Continuous Disclosure Review

On June 22, 2020, Braxia announced that it had been selected for a continuous disclosure review ("CDR") by the British Columbia Securities Commission (the "BCSC") in connection with Braxia's acquisitions of the Three Startups. (¶ 110; Ex. K.)  Braxia further announced that the BCSC had issued a cease trade order ("CTO") suspending Braxia's stock from trading on the CSE pending the Company's filing of Business Acquisition Reports ("BAR") for each

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

4

of the Three Startups (¶ 110; Ex. K), which Braxia promptly did on July 21, 2020. (¶ 57; *see* Exs. L-N.)  The BARs included audited financial statements for the companies disclosing that AGL had $1 in recognizable intellectual property as of February 29, 2020 (Ex. L at 7), and that neither Novo's nor Tassili's assets included any recognizable intellectual property as of February 29, 2020 and December 31, 2019, respectively.  (Ex. M at 7; Ex. N at 6.)

**E.    Braxia Restates Its Unaudited Interim Financial Statements**

On February 17, 2021, Braxia announced that, based on the BCSC review, "the [Financial Statements and accompanying MD&A] need to be restated as the [intellectual property] do[es] not meet the definition of intangible assets for the purposes of [IAS 38 Intangible Assets] and as result will be recorded as transaction costs in the Company's statement of loss and comprehensive loss" (the "IP Issue").  (¶¶ 77-78; Ex. R.)  Braxia also announced that a "shareholder and contracted consultant … of the Company was a related party with respect to the Acquisitions" under IAS 24 (Related Party Disclosures), and that the restatement would "include additional disclosure details with respect to related-party transactions involving the Consultant" (the "Related-Party Issue").  (¶ 77; Ex. R.)  The release did not provide a basis for the revised determination.

Braxia filed its restated financial statements on March 11, 2021 (the "Restatement").  The Restatement revised the accounting treatment for the acquisitions (¶¶ 81-84; Ex. S at 9-11) and the accompanying restated MD&A (the "Restated MD&A") identified Lucas Birdsall ("Lucas") – Gareth's brother and a minority shareholder of the Acquired Businesses – as the related party in question because he was "a significant shareholder and contracted consultant to the Company" who "exerted significant influence over the Company" (¶ 80; Ex. T at 12-13; *see* Ex. S at 13).  Neither document was signed by Gareth or Brohman.

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**F.     The Complaint**

On November 3, 2021, Plaintiff filed the Complaint asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act, and SEC Rules 10b-5(a)-(c).  The alleged misstatements fall into three categories:

1. Summary statements in Braxia's March-May 2020 press releases and MCRs announcing the acquisitions (the "Deal Announcements") (¶¶ 89-91, 93-94, 96, 98, 100; Ex. C at 1-2; Ex. D at 1, 3; Ex. E at 2; Ex. F at 2-3; Ex. G at 2; Ex. H at 1), which Plaintiff claims are misleading because they do not disclose the Related-Party Issue (¶¶ 92, 95, 97, 99, 101).

2. Certain statements in Braxia's May 29, 2020 Financial Statements and MD&A (¶¶ 102-04, 106, 108; Ex. I at 10-11, 14; Ex. J at 7), which Plaintiff claims are misleading because they do not disclose the IP Issue or Related-Party Issue (¶¶ 105, 107, 109); and

3. Braxia's general June 22 and September 15, 2020 press releases updating shareholders on the status of the CDR (¶¶ 110, 112; Ex. K at 1; Ex. O at 1-2) (the "CDR Updates"), which Plaintiff claims are misleading because they do not disclose the IP Issue or Related-Party Issue (¶¶ 111, 113).

## ARGUMENT

**I.     THE COURT SHOULD DISMISS ON *FORUM NON CONVENIENS* GROUNDS IN FAVOR OF CANADA**

"A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties." *Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1142 (9th Cir. 2001).  In determining whether to dismiss the action on *forum non conveniens* grounds, the court examines "(1) whether an adequate alternative forum exists, and (2) whether the balance of private and public interest factors favors dismissal."  *Id.*  Here, as discussed below, Canada is an adequate alternative forum with a far greater nexus

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

to this case than California, or the United States more generally. This Court should, therefore, dismiss this action on *forum non conveniens* grounds.

### A.   Canada is an Adequate Alternative Forum

Under Ninth Circuit law, "the requirement for an adequate alternative forum is usually satisfied if a defendant is amenable to process in the foreign jurisdiction." *Moreno v. Omnilife USA, Inc.*, 483 F. App'x 340, 341-42 (9th Cir. 2012) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981)). The only exception to this rule is the "rare circumstance" where "the remedy offered by the other forum is clearly unsatisfactory." *Id*; *see also Lueck*, 236 F.3d at 1144 ("The effect of *Piper Aircraft* is that a foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong").

Here, Canada is indisputably an adequate alternative forum. Defendants are all residents and citizens of Canada, are subject to service of process there, and, in any event, are willing to accept such service. (Rizakos Decl. ¶¶ 3, 5-6; Birdsall Decl. ¶¶ 4-5, 8; Fish Decl. ¶¶ 4-5, 9; Brohman Decl. ¶¶ 4-5, 8; McIntyre Decl. ¶¶ 4-5, 9; Fuerst Decl. ¶¶ 23-28, 32-33); *see Lueck*, 236 F.3d at 1143 (country an adequate alternative forum "because Defendants … are amenable to service of process [there]"). Moreover, Canada offers the putative class an adequate remedy for the claims alleged in this action. (*See* Fuerst Decl. ¶¶ 6-22, 31-34); *In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005) ("Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws" (citation omitted)); *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (Breyer, J.) (Canadian courts adequate for U.S. investor's securities class action; "small differences in standards and procedural differences (such as greater difficulty in meeting class action requirements …) are beside the point" (citation omitted)). Indeed, there is currently a securities class action premised on the same events pending in the Canadian courts against nearly all the Defendants. (*See* Ex. V.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**B.** **The Private Interest Factors Overwhelmingly Support Dismissal**

The private interest factors considered by the Ninth Circuit include: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Etaliq, Inc. v. Cisco Sys., Inc.*, 2011 WL 13220445, at *3 (C.D. Cal. July 20, 2011) (citation omitted). Here, these factors weigh heavily in favor of dismissal.

*First Private Interest Factor.* None of the parties or anticipated witnesses reside in California. Braxia is incorporated and headquartered in Canada and conducts virtually all of its business there (¶ 14; Rizakos Decl. ¶¶ 3, 5, 7-8, 11, 15.) The Individual Defendants are all Canadian citizens and residents. (Birdsall Decl. ¶¶ 4-6; Fish Decl. ¶¶ 4-6; Brohman Decl. ¶¶ 4-6; McIntyre Decl. ¶¶ 4-6.) Plaintiff lives in Multnomah County, in northern Oregon (Dkt. 16 at 7) – far closer to Canada than to this District. (*See* Ex. BB); *see also Cinematix, LLC v. Einthusan*, 2020 WL 227180, at *3 (N.D. Cal. Jan. 15, 2020) (dismissing on *forum non conveniens* grounds where no party lived in California); *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir. 1983) ("presence of American plaintiffs [] is not in and of itself sufficient to bar a district court from dismissing"). Virtually every other potential witness to the events at issue: Lucas, Braxia's employees, the auditor of the Three Startups' financials, and BCSC representatives – all reside in Canada. (*See* Rizakos Decl. ¶¶ 8, 12-13, 15-16.) The first factor therefore supports dismissal.[4]

*Second Private Interest Factor.* Litigating in this District is highly inconvenient to the litigants given that five out of six reside in Canada, and the

---

[4] The fifth factor favors dismissal for the same reason: Canadian witnesses would be burdened with the cost of travel and lodging necessary to bring them to trial.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

sixth (Plaintiff) lives much closer to Canada than this District.  (*See supra* at 8; *Cinematix*, 2020 WL 227180, at *3 (dismissing where most parties resided in Canada and plaintiff would travel regardless).)  Plaintiff will undoubtedly argue that despite this District's total lack of any nexus to this case, his choice of forum should be given substantial deference.  The Ninth Circuit has warned, however, that such deference is "far from absolute," *Ayco Farms, Inc. v. Ochoa*, 862 F.3d 945, 950 (9th Cir. 2017) (citation omitted) and there are significant reasons why Plaintiff's choice of forum should be given little, if any, deference here.

Critically, as noted above, Plaintiff is not a resident of California, let alone the Central District of California (nor was the original plaintiff), and lives closer to Canada than to this District.  (*See* Dkt. 2 at 1 (Jeffrey Schneider resides in Illinois); Dkt. 16 at 7 (Plaintiff resides in northern Oregon).)  "A U.S. citizen plaintiff is entitled to less deference in his choice of forum if he does not reside in that forum."  *Ayco Farms*, 862 F.3d at 950 (affirming decision "view[ing] [plaintiff's] choice of forum with skepticism" because plaintiff did not reside in California).  His decision to litigate here is thus entitled to, at most, minimal deference.  *See Eastco Int'l Corp. v. Tecma Baja LLC*, 2018 WL 6248549, at *2 (S.D. Cal. Nov. 29, 2018) (viewing "Plaintiffs' choice of forum with skepticism" because "neither of the plaintiffs is a California resident"); *see also Gemini Cap. Grp., Inc. v. Yap Fishing Corp.*, 150 F.3d 1088, 1091-92 (9th Cir. 1998) (according less deference to non-resident U.S. citizens' forum choice); *Symington v. Guillen*, 2016 WL 7486603, at *12 (C.D. Cal. June 30, 2016) (same).  Moreover, courts consistently hold that a plaintiff's choice of forum is "entitled to less deference where, as here, they are suing in a representative capacity." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 479 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83 (2d Cir. 2007); *see Mina v. Red Robin Int'l, Inc.*, 2020 WL 4037163, at *4 (C.D. Cal. Mar. 3, 2020) (discussing similar transfer analysis and noting "a

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

district court accords 'minimal consideration' to a plaintiff's choice of forum in representative actions, even when the plaintiff chooses his or her home forum").

*Third Private Interest Factor*.  All of the hard copy evidence in this case is located in Canada.  (Rizakos Decl. ¶ 9); *see also See Vivendi SA v. T-Mobile USA Inc.*, 586 F.3d 689, 696 (9th Cir. 2009) (upholding dismissal given "vast majority of original, relevant documents in Europe").  Moreover, Canada is not a signatory to the Hague Convention on the Taking of Evidence Abroad (*see* Fuerst Decl. ¶¶ 29-30), and thus this Court cannot compel the production of any evidence controlled by non-parties, a number of which are named in the Complaint (*see, e.g.*, ¶ 4 (Lucas), ¶ 60 (RWE Growth Partners), ¶ 61 (Braxia's auditor), ¶ 73 (the BCSC)) and who will have relevant evidence.  *See Lueck*, 236 F.3d at 1147 (9th Cir. 2001) (affirming dismissal where "district court cannot compel production of much of [the foreign] evidence"); *see also Ramakrishna v. Besser Co.*, 172 F. Supp. 2d 926, 930-32 (E.D. Mich. 2001) (dismissing where "crucial sources of proof" located in country that was a non-signatory to Hague Convention).

*Fourth Private Interest Factor*.  This Court also cannot compel non-party Canadian witnesses to testify.  (*See* Fuerst Decl. ¶¶ 29-30); *Goldcorp*, 946 F.2d at 951-53 (noting "only Canadian courts, not courts within the United States, have the legal power to compel the testimony of" Canadian non-party witnesses).  Given that "[l]ive testimony is especially important in a fraud action," *FUNB v. Arab Afr. Int'l Bank*, 48 F. App'x 801, 804 (2d Cir. 2002) (dismissing where court could not compel testimony), the fourth factor supports dismissal.

*Seventh Private Interest Factor*.  The U.S.-Canadian border was largely closed to travel for an extended period of time due to the COVID-19 pandemic.  (Ex. P at 1-2.)  While it has reopened, travel is still restricted based on vaccination status and, as the recent discovery of the Omicron variant confirms, the situation remains fluid and difficult.  (*See* Ex. P at 10; Ex. W.)  If new travel

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

10

restrictions are put in place it could further complicate both discovery and trial if this litigation continues in a U.S. forum.  (*See* Ex. W.)

### C. The Public Interest Factors Overwhelmingly Support Dismissal

The public factors considered by the Ninth Circuit include:  "(1) [the] local interest of [the] lawsuit; (2) the court's familiarity with governing law; (3) [the] burden on local courts and juries; (4) [the amount of] congestion in the court; and (5) the costs of resolving a dispute unrelated to [the] forum."  *Ayco Farms*, 862 F.3d at 950 (citation omitted).  These factors strongly favor dismissal.

*First Public Interest Factor.*  This District (or the U.S., for that matter) has little interest in this lawsuit.  Plaintiff is asserting claims against a Canadian company and its Canadian officers – which conduct almost no business in the United States, and none in California – based on alleged misrepresentations that were made entirely in Canada.  *See Etaliq*, 2011 WL 13220445, at *6 (dismissing because "Plaintiff ha[d] not identified … any connection this case has to this ***particular*** forum" where parties were non-residents and alleged wrongdoing took place outside forum (emphasis in original)); *Goldcorp*, 946 F.2d 951 ("unusual strength" favoring dismissal where "events surrounding [] plaintiff's 'misrepresentation' … claims took place in Canada").  While the U.S. may have a general interest in enforcing its securities laws, "this alone does not prohibit [a court] from dismissing a securities action on the ground of *forum non conveniens*," *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1002 (2d Cir. 1993), particularly where, as here, the defendants and locus of the alleged wrongdoing are foreign.  *See Goldcorp*, 946 F.2d at 953 (limited interest in securities class action where "underlying circumstances involve[d] actions of a Canadian corporation, its directors, officers and advisors"); *Church v. Glencore PLC*, 2020 WL 4382280, at *6 (D.N.J. July 31, 2020) (no local interest where "Defendants' purported securities violations … occurred abroad in Switzerland, where the alleged misstatements/omissions were drafted and approved").

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

11

*Third Public Interest Factor*.  The burden on this Court and a jury would be unreasonable in the absence of any connection between this case and this District. *See Vivendi*, 586 F.3d at 696 ("burden on local courts and juries unconnected to the case and the costs of resolving a dispute unrelated to the forum [] favor dismissal"); *Glencore*, 2020 WL 4382280, at *6 (same).  Further, the amount of transnational discovery necessary to prosecute and defend this case – especially as the parties cannot rely on the Hague Convention to facilitate the production of non-party witnesses and documents (Fuerst Decl. ¶¶ 29-30) – would unnecessarily burden this Court and the parties.  *See Ibarra v. Orica U.S.A. Inc.*, 493 F. App'x 489, 492 (5th Cir. 2012) (affirming dismissal where "transnational discovery would be burdensome and involve issues of international notice and process").[5]

*Fourth Public Interest Factor*.  "The Central District [of California] is one of the busiest courts in America." *Reddy v. Mediscribes, Inc.*, 2020 WL 2220202, at *7 (C.D. Cal. Feb. 18, 2020) (citation omitted); *see* Ex. CC at 2 (16,450 civil case filings during year ending March 31, 2020, third most in the U.S.).  This Court should not add to its already sizeable case load by retaining a complex securities class action such as this, which has no nexus to this District.

This case should be dismissed on *forum non conveniens* grounds.

## II.    PLAINTIFF FAILS TO STATE A CLAIM

### A.    Standard of Review

To state a claim under Section 10(b) and SEC Rule 10b-5, Plaintiff must plead specific facts showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter[] … and (6) loss causation." *Webb v. SolarCity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018) (citation omitted).  The Court need not accept conclusions stated as "facts" or any other unsupported, conclusory allegations. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996); *see also Ashcroft v.*

---

[5] For the same reason, the fifth factor favors dismissal.  *See Etaliq*, 2011 WL 13220445, at *8 (because "the local interest in this suit is comparatively weak …, the burden … in terms of time and cost, is not justified").

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

*Iqbal*, 556 U.S. 662, 681 (2009).  Nor should the Court accept as true unsupported factual assertions, bare legal conclusions, unwarranted inferences, or allegations contradicted by documents subject to judicial notice.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Prodanova v. H.C. Wainwright & Co.*, LLC, 2018 WL 8017791, at *9 (C.D. Cal. Dec. 11, 2018).

Under the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard, allegations sufficient to survive a conventional motion to dismiss are inadequate in a securities class action.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008) (PSLRA imposes "formidable pleading requirements").  Plaintiffs must "specify each statement alleged to have been [materially] misleading" and "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); *see Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (noting Rule 9(b) also requires pleading "the who, what, when, where and how" of the fraud).

Further, plaintiffs must also allege for each defendant particularized facts giving rise to a "strong inference" of scienter, *i.e.*, a "mental state embracing [an] intent to deceive, manipulate, or defraud."  *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020); 15 U.S.C. § 78u-4(b)(2)(A).  To meet this heavy burden, a complaint must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  *Metzler*, 540 F.3d at 1066.  It "cannot rely on mere motive and opportunity or recklessness, but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."  *Prodanova*, 993 F.3d at 1108 (citation omitted).  A strong inference of scienter also "must be more than merely 'reasonable' or 'permissible' – it must be cogent and ... at least as compelling as any opposing inference" of non-fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007).

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

13

Katten

KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**B.**    **Plaintiff's Section 10(b) Claim Fails for Multiple Reasons**

**1.**    **The Deal Announcements and CDR Updates Were Not False or Misleading**

"Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011). "Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Id*. (quoting 17 CFR § 240.10b–5(b)); *see also Basic v. Levinson*, 485 U.S. 224, 239, n. 17 (1988) ("Silence, absent a duty to disclose is not misleading under Rule 10b-5."). In other words, "Rule 10b–5 … prohibit[s] only misleading and untrue statements, not statements that are incomplete." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts" and a supposed duty of "completeness" "has no support in the case law"). A statement is misleading by omission only where it "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*

Here, the Deal Announcements – consisting of summary disclosures of deal signings and general deal terms (¶¶ 89-91, 93-94, 96, 98, 100; Exs. C-H) – are inactionable because Plaintiff has not and cannot allege with particularity why or how they were misleading. (*See* ¶¶ 92, 95, 97, 99, 101); *Brody*, 280 F.3d at 1006 ("to survive a motion to dismiss under the [PSLRA], the plaintiffs' complaint must specify the reason or reasons why the statements … were misleading or untrue, not simply why the statements were incomplete"); *Mendoza v. HF Foods Grp. Inc.*, 2021 WL 3772850, at *9 (C.D. Cal. Aug. 25, 2021) ("By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint … unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful" (quoting *Metzler,* 540

14

F.3d at 1061)).  Plaintiff does not and cannot plead that Defendants had an affirmative duty to disclose in the Deal Announcements that the acquisitions were allegedly related-party transactions.  *See In re Pharmacielo Ltd. Secs. Litig.*, 2021 WL 4459756, at *4-5 (C.D. Cal. Apr. 16, 2021) (dismissing claim that deal announcement was "*per se* material and misleading" because it did not disclose the related-party nature of the transaction); *see also Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *10 (D.N.J. Apr. 30, 2020) (same).  Moreover, the Deal Announcements disclosed the general terms of the acquisitions only, and were not intended to disclose all aspects of the deals.  They did not discuss the ownership of Braxia or the Acquired Businesses, did not represent that the acquisitions were *not* related-party transactions, and cannot be construed as creating such an impression.  A company is not required to provide accounting disclosures concerning an acquisition target every time it discusses the transaction in general terms, and courts routinely dismiss claims based on such allegations. *See, e.g.*, *Arkansas Tchr. Ret. Sys. v. OSI Sys., Inc.*, 2019 WL 2895625, at *3-4 (C.D. Cal. May 7, 2019) (dismissing claim that company concealed prior sale of subsidiary's equity because statement at issue did "not state that no one else owns stock in the [] subsidiary"); *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 884-85 (N.D. Cal. 2020) (dismissing because "announcement … does not broach any of the topics in the alleged omissions," but is "simply silent about them").

The general CDR Updates are inactionable for the same reason.  (¶¶ 110, 112; Exs. K, O.)  They did *not* address ownership of the Acquired Businesses, or any details concerning the Three Startups – let alone the accounting treatment for their assets.  *See, e.g.*, *Brody*, 280 F.3d at 1006 (affirming dismissal of claim press release omitted information about potential merger because "press release [] neither stated nor implied anything regarding a merger"); *Pharmacielo*, 2021 WL 4459756, at *4-5.  Moreover, to the extent Plaintiff is alleging that Defendants were required to disclose the conclusion of the ongoing CDR before it was

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

15

finalized, he is clearly wrong. *See In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019) ("Defendants had no requirement to elaborate" on investigated conduct because, at the time of the statement, the investigation "had not made any formal finding"); *Kauffman v. Natural Health Trends Corp.*, 2019 WL 7165921, at *5 (C.D. Cal. Dec. 20, 2019) (same; citing cases); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[d]isclosure is not a rite of confession" (citation omitted)).

### 2. Plaintiff Fails to Plead a Strong Inference of Scienter

#### a. Scienter Cannot Be Inferred From the Restatement

Plaintiff's paper-thin scienter allegations are not nearly as compelling as the non-fraudulent inference that, at most, Defendants inadvertently erred in applying the complex provisions of IAS 24 (Related Party Disclosures) and IAS 38 (Intangible Assets). Significantly, in pleading scienter, the Complaint "does not rely on statements from confidential witnesses, does not rely on internal [] documents, does not contend that Defendants violated [] internal accounting policies, and does not allege facts that suggest the Defendants attempted to deceive [Braxia's] auditors," all of which "negate[s] an inference that Defendants acted intentionally or with deliberate recklessness." *In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *13 (N.D. Cal. Feb. 17, 2010); *see also Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 2007 WL 951968, at *5 (D. Ariz. Mar. 28, 2007) (dismissing restatement case where plaintiff did not "identif[y] a single report, memorandum, witness, or other source for its allegation of Defendants' knowledge"). Instead, Plaintiff appears to be relying primarily on the fact of the restatement itself to demonstrate a strong inference of scienter, which is improper under Ninth Circuit law. *Zucco*, 552 F.3d at 1000 (the "mere publication of a restatement is not enough to create a strong inference of scienter"). To plead a strong inference of scienter in a restatement case, the "plaintiff[] must plead facts demonstrating that defendants

16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

knew of the relevant [accounting] principles and knew how the company was interpreting them." *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1361 (C.D. Cal. 2014); *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (accounting violations, "even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state."). A plaintiff "must [also] plead facts explaining why employing an incorrect interpretation was so unreasonable or obviously wrong that it gives rise to a cogent inference of deliberate wrongdoing." *Ixia*, 50 F. Supp. 3d at 1361.

Here, Plaintiff never pleads any fact demonstrating the Defendants' knowledge of the relevant accounting rules, as he must. Nor does Plaintiff explain how the analysis of whether an asset can be recognized as an intangible asset under IAS 38 is so simple or obvious that it could overcome the absence of non-conclusory scienter allegations in the Complaint. Indeed, rather than address the specifics of IAS 38, Plaintiff concocts a strawman argument, alleging that Braxia's alleged accounting error was obvious because it was accounting for goodwill in an asset sale, which is allegedly not permitted under IAS 38. (¶¶ 47-49; 57-58.) This is clearly wrong. Braxia initially accounted for the assets as intellectual property, not goodwill, and, as Plaintiff acknowledges (¶¶ 102-04), consistently disclosed both in the original filings and in the restated filings, that "there was no goodwill generated on the transactions." (Ex. I at 10; Ex. S at 9.)

In reality, the recognition analysis under IAS 38 involves the complex and technical assessment of whether and when the development of scientific know-how and intellectual property of companies such as AGL, Novo, and Tassili becomes "identifiable," is "controlled," and can be said to have "future economic benefits." (Ex. Z ¶¶ 5, 9-17.) Each of these terms has a separate definition that is contingent upon numerous factors and circumstances and is subject to interpretation and judgment. (*See id.* ¶¶ 12-17); *see also, e.g.*, *Matter of Swift*

17

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

*Air, L.L.C.*, 624 B.R. 694, 707 (D. Ariz. 2020) ("Given the difficult nature of [intangible assets'] valuation, any valuation would be subject to some level of doubt."); *In re Soup Kitchen Int'l Inc.*, 506 B.R. 29, 41 (Bankr. E.D.N.Y. 2014) (reasoning that the valuation of "intangible assets such as [intellectual property] is a complicated issue that is subject to interpretation").

Here, Defendants believed that the assets acquired from the Three Startups met the recognition criteria of IAS 38. The BCSC disagreed with this accounting (the Complaint does not specifically plead why) and Braxia ultimately restated without recognizing these assets.[6] But, as discussed above, this conclusion was by no means obvious. Indeed, the complex nature of this accounting is demonstrated by the fact that the Canadian Securities Administrators, the overseer of the CDR Program, identified recognition and accounting for intangible assets as a "common deficienc[y]" in its 2020 report on the program. (Ex. Q at 3); *see In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1207 (D. Ariz. 2009) (fact that company "was not alone in its mistaken interpretation of" accounting rule undermined scienter). Given the complexity involved in the IAS 38 recognition analysis, Plaintiff's attempt to infer scienter from the mere fact of the restatement concerning the IP Issue fails. *See McGee v. Am. Oriental Bioengineering, Inc.*, 2014 WL 12586107, at *11 (C.D. Cal. Sept. 23, 2014) ("because the accounting [for sale transaction] was not straightforward or simple, [the company's] improper accounting for the … transaction does not raise a strong inference of scienter").

The same is true of the Related-Party Issue. Plaintiff misleadingly cites to only part of IAS 24 to suggest that Lucas was obviously a related party because he was "a close member of [Gareth's] family." (¶ 51.) Plaintiff omits, however, that only children, spouses, and dependents of a senior company officer, *i.e.*, not

---

[6] As noted above, the restated documents were not signed by Gareth or Brohman, and nothing herein should be viewed as an admission on their part that the initial accounting was incorrect.

18

Katten
KattenMuchinRosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

independent adult siblings, are presumptively related parties with the company under IAS 24. (*See* Ex. X at 5.) Indeed, Braxia's determination that Lucas was a related party was not based on his status as Gareth's sibling. Rather, as Braxia disclosed, this determination was made because Lucas was a shareholder and contracted consultant of Braxia and it was ultimately determined, after discussions with regulators, to include in its disclosure a statement that he exerted "significant influence" over the Company. (¶ 80; Ex. S at 13; Ex. T at 12; Ex. X at 4.) The definition of "significant influence," found in IAS 28, is also omitted from the Complaint. This phrase means "the power to participate in the financial and operating policy decisions of the investee but is not control or joint control of those policies." (Ex. Y ¶ 3.) Given the haziness of this standard, IAS 28 provides a rule of thumb: shareholders with 20% or more of the voting power of a company presumptively have significant influence and those with less than 20% presumptively do not. (*Id.* ¶ 5.) Significantly, here, Plaintiff has not and cannot allege that Lucas met the 20% ownership threshold for presumptive significant influence (he never came close). Nor does Plaintiff provide any details concerning Lucas's job duties as a consultant of Braxia. Absent such allegations or any other specific allegations on point, Lucas presumptively did not have significant influence of Braxia, and thus Plaintiff cannot show that Lucas was obviously a related party from the outset. *See Perrin v. SouthWest Water Co.*, 2011 WL 10756419, at *10 (C.D. Cal. June 30, 2011) (dismissing restatement case where the "language employed to explain these [accounting rules] … fails to illustrate the simplicity of the violated rules").

### b.  Scienter Cannot Be Inferred from Gareth and Brohman's Resignations

Plaintiff's threadbare attempt to infer scienter from Gareth's and Brohman's resignations on May 11, 2020 and December 7, 2020, respectively (¶ 130; *see* ¶¶ 127-29), also fails. To infer scienter from a resignation, a plaintiff "must plead facts refuting the reasonable assumption that the resignation occurred

19

as a result of restatement's issuance itself." *Zucco*, 552 F.3d at 1002 ("[m]ere conclusory allegations that a[n] [officer or director] resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter.")

The Complaint lacks any such refutation. Moreover, the timing of the resignations undercuts any inference of scienter. Gareth resigned as CEO *before* Braxia even issued its *original* Financial Statements and MD&A on May 29, 2020. Brohman resigned as CFO over seven months after Gareth stepped down as CEO, making illogical any inference that they were forced out for the same alleged misconduct. Similarly, Brohman's resignation as CFO and Gareth's resignation as director (in November 2020), long after Braxia's June 22, 2020 disclosure of the CDR and CTO (which Plaintiff alleges was corrective), further undermines any inference of scienter. *See Mallen v. Alphatec Hldgs., Inc.*, 861 F. Supp. 2d 1111, 1138 (S.D. Cal. 2012) ("timing of [CFO's] resignation [] two months after the [] 'corrective announcement,' … does not support" scienter).[7]

Plaintiff's misguided allegation that Braxia "admitted" that Gareth and Brohman's departures "were all due to their roles in the events at issue" is obviously wrong and beside the point. (¶ 129 (citing Ex. AA at 6).) Braxia merely stated that "[t]he issues that gave rise to the CTO occurred under the original management." (Ex. AA at 6.) This statement does not even suggest negligence on the part of Gareth or Brohman, let alone constitute an admission of fraud. *See Zucco*, 552 F.3d at 1002; *Hessefort v. Super Micro Computer, Inc.*, 2020 WL 1551140, at *8 (N.D. Cal. Mar. 23, 2020) (allegation that "restatement referred to [executives'] replacement in its section on remedial measures" was "not particularized enough" to imply scienter).

---

[7] Plaintiff's reliance on resignations of three Braxia directors between May 22, 2020 and February 1, 2021 (¶¶ 127-28), is similarly flawed as he fails to allege with specificity how the resignation suggest scienter for any Defendants. *See Zucco*, 552 F.3d at 1002 ("plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one").

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**c.       Applying Technical Accounting Standards is Not a Core Operation of Braxia**

Plaintiff also improperly invokes the "core operations" theory, asking this Court to assume Defendants knew that Braxia had supposedly misapplied the relevant accounting rules because the Acquired Businesses were important to Braxia.  (¶ 131); *see Prodanova*, 993 F.3d at 1111 (the core operations theory "presumes that 'corporate officers have knowledge of the critical core operation of their companies.'" (quoting *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014))).  As an initial matter, the theory is disfavored in the Ninth Circuit, which routinely rejects such allegations.  *See Zucco*, 552 F.3d at 1000 (citing cases).  In any event, Plaintiff's claim here is based on Braxia's analysis and application of IAS 24 and IAS 38, not the operations of Braxia or the Acquired Businesses (*see, e.g.*, ¶ 88) and "[n]umerous courts have found that accounting … determinations are not part of a company's core operation."  *Oklahoma Firefighters Pension & Retirement Sys. v. Ixia*, 2015 WL 1775221, at *31 (C.D. Cal. Apr. 14, 2015) (collecting cases) and *Ixia*, 50 F. Supp. 3d at 1361 (C.D. Cal. 2014) ("even were deferred revenue associated with a 'core operation,'" the doctrine did not apply because "[t]he misrepresentation here involves allegedly intentional misapplication of accounting principles").[8]

**d.       Plaintiff Does Not Allege a Motive for Fraud**

Plaintiff's motive allegations, as a whole, rebut rather than support an inference of scienter.  First, Plaintiff's attempt to plead motive based on Brohman's sales of Braxia stock during the Class Period backfires.  (*See* ¶ 125.) Plaintiff does not allege that any of the three other Individual Defendants sold a single share of Braxia stock during the Class Period, which "undermines any inference of scienter from stock sales."  *In re Rackable Sys., Inc. Sec. Litig.*, 2010

---

[8] Nor can scienter otherwise be inferred from the Individual Defendants' senior roles at the company.  *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) ("high rank … is insufficient, without more, to infer a strong inference of scienter").

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

WL 3447857, at \*9 (N.D. Cal. Aug. 27, 2010); *see also Metzler*, 540 F.3 at 1067 ("[the Ninth Circuit] typically require[s] … corroborative sales by other defendants … to allow insider trading to support scienter").

Moreover, stock sales are not suspicious unless they are "dramatically out of line with prior trading practices." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (citation omitted). "[P]laintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005. Here, the Complaint alleges nothing about Brohman's prior stock trades and thus cannot establish motive. *DeMarco v. DepoTech Corp.*, 32 F. App'x 260, 262 (9th Cir. 2002). Moreover, Brohman's net proceeds of $173,250 (¶ 125) are also "not sufficiently large to create an inference of scienter." *In re Versant Object Tech. Corp.*, 2001 WL 34065028, at \*10 (N.D. Cal. Mar. 30, 2001) (same conclusion with net proceeds of $833,092).

Second, Braxia's June 2020 private placement (¶ 132) is insufficient. "[R]outine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient" for motive. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *see In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at \*12 (C.D. Cal. Sept. 20, 2017) (citing cases).

Third, while it may have superficial appeal, Plaintiff's allegation that Gareth was motivated to enrich his brother, a minority stockholder in the Acquired Businesses (*see* ¶ 124), is conclusory and illogical. Gareth is not alleged to have sold any shares of Braxia stock during the Class Period or to have personally benefited from the acquisitions. It is illogical to infer that Gareth had motive to enrich his brother where he made no attempt to personally benefit from the alleged accounting errors. Moreover, the Financial Statements and MD&A were also signed by the other Individual Defendants. (*See* Ex. I at 3, 20-21.) Given that they clearly had no familial motive in approving these filings, it undercuts any inference that Gareth signed the filings based on such a motive.

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**e.      Plaintiff Fails to Plead a Holistic Inference of Scienter**

Even if some inference of scienter could be drawn from Plaintiff's deficient allegations (it cannot), it is outweighed by the more compelling inference that, at most, Braxia unintentionally misapplied IAS 24 and IAS 38.  *See Prodanova*, 993 F.3d at 1113 (upholding dismissal where, "considering the allegations as a whole, it is more likely that [defendant] engaged in merely negligent conduct").  First, Braxia and the Acquired Businesses were startup companies in a highly experimental area of medicine.  (*Supra* at 3-4.)  The analyses and judgment calls Braxia had to make under the accounting rules were not straightforward and had to be made quickly given that Braxia acquired the companies in close succession shortly before it filed the Financial Statements and MD&A.  (*See id.*); *In re Swisher Hygiene, Inc.*, 2015 WL 4132157, at *12 (W.D.N.C. July 8, 2015) ("accounting errors occurred … during a hectic period of tremendous growth" such that it was "unfortunate yet unsurprising that complicated accounting issues arose and that honest mistakes may have unintentionally occurred").

Second, the revisions "d[id] not impact the Company's cash position" (Ex. R at 1) and the Complaint does not and cannot allege with particularity that they had any effect on Braxia's operating revenues, cash balances, ability to make acquisitions or any other facet of the Company's financial health, operations or prospects.  *In re Medicis Pharm*, 689 F. Supp. 2d at 1206 (fact that accounting error had no "effect on cash, liquidity, or viability of [company's] core-business operations" was inconsistent with scienter); *In re Rural Cellular Corp. Sec. Litig.*, 2004 WL 1278725, at *2 (D. Minn. June 6, 2004) (no scienter where "Plaintiffs fail[ed] to submit facts to indicate any relationship between the overstatement of intangible assets and revenues, operating income, or cash flow").

Third, the first objective of CDR Program is to "educate issuers" concerning their disclosure obligations, particularly in emerging industries, where there may be less of an established track record in financial reporting and

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

23

mistakes may be more likely.  (Ex. A at 1-2; Ex. Q at 2.)  Moreover, there are no allegations that, here, the CDR led to any type of enforcement activity (it did not).

Fourth, Braxia's prompt filings of the BARs less than one month after announcing the CDR (*see* ¶¶ 55, 57) further undercuts an inference of scienter. *See, e.g.*, *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *6 (S.D.N.Y. Mar. 23, 2017) (prompt remedial action by issuer undercuts an inference of scienter), *reconsideration denied*, 2017 WL 2937620 (S.D.N.Y. July 7, 2017).

Accordingly, viewed holistically, the strongest inference here is that, at most, Defendants made a mistake.  Plaintiff has thus failed to plead a strong inference of scienter against any of the Defendants.  *See IXIA*, 50 F. Supp. 3d at 1369 (most compelling inference was company "simply misreported deferred revenue in the midst of a series of acquisitions").

### 3.    Plaintiff Has Failed to Adequately Plead Loss Causation

The Complaint should also be dismissed because it does not plead loss causation, *i.e.*, "that the defendant's share price fell significantly after the truth became known." *Metzler*, 540 F.3d at 1062 (citation omitted).  Plaintiff's first alleged corrective discourse – Braxia's June 22, 2020 announcement of the CDR – said nothing about Braxia's accounting or the ownership of either Braxia or the Acquired Businesses.  (*See* ¶ 117; Ex. K.)  Under Ninth Circuit law, such an "announcement of an investigation does not 'reveal' fraudulent practices to the market[,]" and is thus not a corrective disclosure, because "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal." *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014); *Rok v. Identiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan. 4, 2017) (announcement not corrective because it did not reveal specific financial controls weakness alleged in complaint), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

The same is true of Plaintiff's second alleged corrective disclosure – the February 17, 2021 press release.  Plaintiff admits that the IP Issue was disclosed

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

24

on July 21, 2020 – seven months earlier – when Braxia filed the BARs (*see* ¶¶ 60-64, 66-68, 70-72), which "reveal[ed] that none of the acquisitions held any intellectual property." (¶ 57; *see supra* at 5; ¶ 146 (Braxia's stock traded in an efficient market)); *Graves v. AECOM*, 2017 WL 5502774, at *12 (C.D. Cal. June 19, 2017) (report identifying accounting errors that overstated assets not a corrective disclosure because it did not "provide[] any additional … information than was previously provided to investors" through "prior financial statements"). Moreover, the February 17, 2021 press release did not disclose Lucas as the related party, Lucas's relationship with Gareth, or Braxia's restated conclusion that Lucas "exerted significant influence over the Company." (Ex. R.) Lucas's involvement was first disclosed later, in the Restated MD&A on March 11, 2021 (¶ 80; Ex. T at 12-13), after which Braxia's stock price *increased* (Ex. U). The release thus cannot serve as a corrective disclosure.

### C.     Plaintiff Fails to Plead a "Scheme Liability" Claim

Plaintiff's "scheme liability" claim under SEC Rules 10b-5(a) and (c) is based entirely upon the same alleged misstatements concerning the IP issue and the Related-Party Issue discussed above and should be dismissed for the same reasons. (*See, e.g.*, ¶ 155); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *32 (S.D.N.Y. Mar. 30, 2021) (scheme claims based on "dissemination of false or misleading statements … must still adequately plead the predicate misconduct – making a false statement or omission of material fact – to be actionable" (citation omitted)).

### D.     Plaintiff's Section 20(a) Claim Fails

Because Plaintiff fails to plead a primary Section 10(b) violation, his Section 20(a) claim should also be dismissed. *See In re Rigel*, 697 F.3d at 886.

## III.    CONCLUSION

The Complaint should be dismissed with prejudice.

DATED:  December 20, 2021

KATTEN MUCHIN ROSENMAN LLP

By: */s/ Bruce G. Vanyo*

Bruce G. Vanyo
Email:  bruce@katten.com
Deeksha Kohli
Email: deeksha.kohli@katten.com
2029 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:  (310) 788-4400
Facsimile:  (310) 788-4471

Jonathan A. Rotenberg (admitted *pro hac vice*)
Email: jonathan.rotenberg@katten.com
Thomas M. Artaki (admitted *pro hac vice*)
Email: thomas.artaki@katten.com
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Counsel for Defendant Champignon
Brands Inc. n/k/a Braxia Scientific Corp.,
Gareth Birdsall, Matthew Fish,
Stephen Brohman, and Roger McIntyre*

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# **<u>Exhibit A</u>**

# Lead Plaintiff's Amended Complaint

Robert V. Prongay (SBN 270796)
Casey E. Sadler (SBN 274241)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:    rprongay@glancylaw.com
           csadler@glancylaw.com

*Counsel for Lead Plaintiff Michael G.*
*Quinn and Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY N. SCHNEIDER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHAMPIGNON BRANDS INC., GARETH BIRDSALL, and MATTHEW FISH, <br><br> Defendants. | Case No. 2:21-cv-03120-JVS-KES <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br><br> **<u>DEMAND FOR JURY TRIAL</u>** |

AMENDED CLASS ACTION COMPLAINT

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................... 1

II.   JURISDICTION AND VENUE ............................................................. 3

III.  PARTIES . . . . . . . . . . . . . . . ....................................................... 4

IV.  SUBSTANTIVE ALLEGATIONS ........................................................ 6

      A.     After Going Public, The Company Goes On An Acquisition Spree ................................................................................................. 6

             1.     The Company Announces The Four Acquisitions ................... 7

                     a)     Artisan Growers Ltd. ................................................ 7

                     b)     Novo Formulations Ltd. ........................................... 8

                     c)     Tassili Life Sciences Corp. ...................................... 8

                     d)     AltMed Capital Corp. ............................................ 10

              2.     Champignon Conceals That The Brother Of Its CEO, Who Was A Consultant Of The Company, Owned Each Of These Four Entities, Making Them All Related Party Transactions ............................................................................. 11

      B.     Relevant Accounting Principles ........................................................ 12

              1.     Asset Acquisitions, Unlike Business Acquisitions, Do Not Result In The Recognition Of Goodwill ................................. 12

              2.     Related Party Relationships Must Be Disclosed .................... 13

      C.     During The Class Period, Champignon Improperly Attributes Nearly All Of The Value Of The Acquisitions To Purported Intellectual Property ........................................................................ 15

              1.     AGL ......................................................................................... 16

               2.     NFL ......................................................................................... 17

               3.     Tassili .................................................................................... 19

AMENDED CLASS ACTION COMPLAINT

i

D.      The British Columbia Securities Commission Issued Replacement Cease Trade Orders Pending Champignon's Filing Of Additional Reports ................................................................20

E.      The Company Eventually Is Compelled To Disclose The Acquisitions Were All Related Party Transactions And Admit That The Accounting For The Acquisitions Was Improper Because As The Assets Did Not Meet The Definition Of Intangible Assets ........................................................................21

V.      DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD .....................................................................................24

VI.     LOSS CAUSATION AND DISCLOSURES AFTER THE CLASS PERIOD .....................................................................................34

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................36

A.      The Birdsall Family And Other Corporate Executives Profited Immensely From The Fraud .................................................37

B.      The Improper Conduct Was Only Disclosed After The Removal Of The Company's Executives And Directors ...................................37

C.      The Company's Transactions Were Core Activities That The Executives Were Aware Of ...............................................................39

D.      Defendants Conducted A Private Placement While Misleading The Market ......................................................................40

VIII.   CORPORATE SCIENTER ALLEGATIONS .............................................40

IX.     CLASS ACTION ALLEGATIONS ...............................................................41

X.      UNDISCLOSED ADVERSE FACTS .............................................................42

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...........................................................43

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .........................................................45

XIII.   CLAIMS ..............................................................................................46

AMENDED CLASS ACTION COMPLAINT

ii

XIV.   PRAYER FOR RELIEF  ...............................................................................50

XV.    JURY TRIAL DEMANDED  ......................................................................51

Lead Plaintiff Michael G. Quinn ("Plaintiff" or "Quinn"), brings this Amended Class Action Complaint against Champignon Brands Inc. n/k/a Braxia Scientific Corp. ("Champignon" or the "Company"), Gareth Birdsall ("Gareth Birdsall"), Roger McIntyre ("McIntyre"), Stephen Brohman ("Brohman"), and Matthew Fish ("Fish") (collectively, "Defendants"). The allegations herein are based on Plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: securities filings by Champignon; press releases and other public statements issued by the Company; media reports about the Company; and other publicly available information concerning Champignon. Lead Counsel's investigation into the matters alleged herein is ongoing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of himself and the class he seeks to represent, Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons or entities that purchased or acquired Champignon securities between March 27, 2020 and February 17, 2021, inclusive (the "Class Period") and were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. This is a straightforward case of securities fraud. Champignon, a fledgling company founded by a twenty-four year old novice, conducted its initial public offering in February 2020. Over the next two months, the Company announced a series of four acquisitions that it claimed would provide valuable intellectual property, as well as research and development advancements, and be accretive of the Company's business objectives. These announcements led to

AMENDED CLASS ACTION COMPLAINT

1

increased shareholder interest and an dramatic increase in the Company's share price.

3. Within weeks of these acquisitions, in June 2020, Champignon conducted a private placement to raise more than $15 million,[1] mere months after raising $3 million in its initial public offering, further fueling investor interest.

4. Collectively, these transactions enriched Lucas Birdsall, the brother of the Company's then-CEO, Gareth Birdsall. Unbeknownst to shareholders, Lucas was not only a shareholder in each of the four acquired companies, but he was also a consultant who wielded "significant influence" over the Company, making him a related party to the transactions. He received more than $7.48 million in cash and shares for consulting fees, stock options, and compensation in connection with the acquisitions and his consulting for the Company, but his involvement was not disclosed to Champignon's shareholders during the Class Period.

5. Indeed, only Defendants and Lucas Birdsall benefited from these acquisitions. The Company had paid tens of millions of dollars in stock for four nascent, unprofitable companies with nominal assets.

6. Defendants attempted to obscure this by accounting for the acquisitions so as to allocate much of the purchase price to purported "intellectual property." However, they did not submit any expert report measuring the value of such intellectual property. This indicated that purchase price should have been actually attributed the goodwill and the Company did not have a legitimate basis for treating it as intellectual property. In fact, when scrutiny from the British Columbia Securities Commission forced the Company to file detailed reports about the acquired companies, it was shown that three of these companies lacked revenue-generating assets.

---

[1] All price figures are in Canadian Dollars unless otherwise indicated.

7. Champignon was ultimately forced to restate its financial results because these acquired companies *did not even meet the definition of an actual business*. As a result, the excess amounts paid in the transactions were restated as transaction costs, thereby reducing the Company's intangible assets from roughly $12 million to $111,929 and increasing its deficit from about $3.08 million to more than $16.6 million.

8. Shareholders that relied on the Company's disclosures suffered substantial losses. Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's stock. Plaintiff and other Class members have suffered significant losses and damages at the hands of Defendants and are entitled to redress.

## II. JURISDICTION AND VENUE

9. The claims asserted here arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated by the SEC (17 C.F.R. § 240.10b-5).

10. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this Judicial District under 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District as the alleged misstatements entered and subsequent damages took place herein.

12. In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of a national securities markets.

## III.   PARTIES

13.   Plaintiff, as set forth in his previously filed certification, incorporated by reference herein (Dkt. No. 17-2), purchased Champignon securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.   Defendant Champignon, which is now known as Braxia Scientific Corp.,[2] is incorporated under the laws of the province of British Columbia and its primary office is located at 1430 Hurontario St., Mississauga, Ontario L5G 3H4, Canada.[3]   During the Class Period, the Company's shares traded on the Canadian Securities Exchange under the ticker symbol "SHRM," as well as on the quotation board of the Frankfurt Stock Exchange under the ticker symbol "496."   The Company's common shares also traded on the OTC Pink Open Market until April 23, 2020 when its shares began trading on the OTCQB Venture Markets Group.

15.   Throughout the Class Period, Champignon, through its officers and directors, published periodic filings and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

16.   Defendant Gareth Birdsall ("Gareth Birdsall") was the Company's President and Secretary until May 6, 2020, and the Company's CEO until May 11, 2020, and a director of the Company until November 23, 2020.   Gareth Birdsall founded the Company in 2019.

---

[2] For purposes of this complaint, the use of the term Champignon includes Braxia and any predecessor entities.

[3] At the start of Class Period, the Company's headquarters were located at 1177 West Hasting Street, Suite # 2300, Vancouver, Britch Columbia V6E 2k3, Canada.

17. Defendant Roger McIntyre ("McIntyre") has been the Company's CEO since May 11, 2021 and a director since July 22, 2020. Prior to his employment with Champignon, McIntrye was a founder and substantial shareholder of AltMed Capital Corp.

18. Defendant Stephen Brohman ("Brohman") was Champignon's Chief Financial Officer ("CFO") and a director of the Company at all relevant times until December 7, 2020.

19. Defendant Matthew Fish ("Fish") was the Company's president since May 2020 and a director since August 2019.

20. Defendants Gareth Birdsall, McIntyre, Brohman and Fish (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were actively concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the misrepresentations pleaded herein.

21. Throughout the Class Period, the Individual Defendants often spoke to investors and analysts. The Individual Defendants possessed the power and authority to control the contents of the Company's public filings. During the Class Period, the Individual Defendants signed or authorized the signing of and certified the accuracy of the Company's financial results.

## IV.    SUBSTANTIVE ALLEGATIONS

22.    According to the Company, Champignon is focused on the formulation and manufacturing of novel ketamine, anesthetics, and adaptogenic delivery platforms for nutraceutical and psychedelic medicine while being supported by a leading psychedelics medicines clinic platform.  According to the Company, it is pursuing the development and commercialization of rapid onset treatments capable of improving health outcomes, such as depression and post-traumatic stress disorder ("PTSD"), as well as substance and alcohol use disorders.

23.    The Company was incorporated on March 26, 2019 in British Columbia, Canada by Gareth Birdsall under the name Nature Leaf Wellness Corp.[4] According to the Company, Gareth Birdsall was 24 years old at the time, and his prior jobs were working as an installation technician for an appliance company and a "turf management technician" at a golf course.

24.    On February 28, 2020, the Company closed its initial public offering, and it began trading on the Canadian Securities Exchange (the "CSE") on March 2, 2020.    In the offering, the Company issued 18,916,667 common shares of Champignon at a price of $0.15 per share for total gross proceeds of $2,837,500.05. Thereafter, the Company's shares began trading on the OTC on March 17, 2020.

### A.    After Going Public, The Company Goes On An Acquisition Spree

25.    With the funds obtained and the shares issued in the offering, the Company began acquiring entities in a massive purported expansion of the scope and scale of the business.  In March and April 2020 alone, Champignon acquired four entities: Artisan Growers Ltd., Novo Formulations Ltd., Tassili Life Sciences Corp. and AltMed Capital Corp.  According to the Company, these acquisitions, among other things, "expand[ed] the Company's preclinical trial pipeline, as well as its aggregation of broad intellectual property (IP)," "accelerate[d] the architecture of

---

[4] On June 7, 2019, the Company changed its name to Champignon Brands Inc.

Champignon's patent portfolio" and "secur[ed] valuable infrastructure to expedite our R&D pursuits." In essence, the Company touted these transactions as benefiting Champignon's intellectual property catalog.

26. These four acquisitions cost the Company more than $90 million and resulted in Champignon's stock skyrocketing: the Company's stock was $0.295 per share (USD) at the start of the Class Period and the Company's market capitalization was $6.05 million (USD) and had climbed to $1.34 per share (USD) and $108 million (USD), respectively, by the end of May.

27. This stock appreciation was short-lived because (as discussed herein) the acquired companies were unprofitable, and Champignon had failed to account for these transactions accurately under applicable accounting principles or document them in accordance with Canadian securities law.

28. In reality, three of these companies were not actual businesses—they had been incorporated mere months before they were acquired by Champignon and they lacked any valuable assets, such as intellectual property, characteristic of businesses. Ultimately, the Company admitted that it immensely overpaid for the three companies, and the transactions essentially enriched Champignon's CEO's brother, Lucas Birdsall, who was a shareholder in each of the four companies and received a substantial number of Champignon shares in connection with the acquisitions.

### 1. The Company Announces The Four Acquisitions

#### a) Artisan Growers Ltd.

29. On March 13, 2020, Champignon issued a press release announcing that it had entered into a definitive agreement to acquire Artisan Growers Ltd. ("AGL"). The press release stated that AGL is "a British Columbia based craft mushroom cultivator and supplier" that "operates a craft mushroom cultivation facility capable of producing an assortment of organic craft mushroom varietals . . .

." AGL was incorporated on September 9, 2019, *i.e.* about six months before the acquisition.

30. Champignon would "acquire 100 percent of the issued and outstanding shares of Artisan Growers for total consideration of 8 million common shares in the capital of the Company," and a finder's fee was applicable to the transaction. The transaction closed on March 17, 2020 for a total purchase value of $2,904,000.

### b) Novo Formulations Ltd.

31. On March 19, 2020, Champignon issued a press release announcing that it had entered into a definitive agreement to acquire Novo Formulations Ltd. ("NFL"). The press release stated that NFL is "a specialty biotechnology company focused on developing novel and innovative delivery systems for the pharmaceutical and nutraceutical industries." NFL offered "novel delivery system platforms, as well as complementary R&D advancements, [which] will accelerate the architecture of Champignon's patent portfolio as the Company persists in being a first mover in the existing consumer package goods . . . and emerging psychedelic medicine arenas." It was incorporated on September 25, 2019, *i.e.*, six months prior to the acquisition.

32. Champignon would "acquire 100 percent of the issued and outstanding shares of Novo Formulations for total consideration of 12.5 million common shares in the capital of the Company at a deemed price of $0.2475 per share," and a finder's fee was applicable to the transaction. The transaction closed on March 20, 2020 for a total value price of $3,915,000.

### c) Tassili Life Sciences Corp.

33. On March 27, 2020, Champignon issued a press release announcing that it had entered into a definitive agreement to acquire Tassili Life Sciences Corp. ("Tassili"). The press release stated that Tassili was working with scientists and physicians at the University of Miami "to develop effective psilocybin-based

therapeutics for the treatment of mild traumatic brain injuries (mTBI) and/or post-traumatic stress disorder (PTSD)." Tassili was incorporated on March 13, 2018.

34. The acquisition would purportedly "expand[] the Company's preclinical trial pipeline, as well as its aggregation of broad intellectual property (IP) related to the development of novel psychedelics therapeutics and their delivery systems, targeting multiple pathological psychological diseases."

35. However, Tassili had not obtained any patents yet. In a section entitled "Psilocybin Patent Portfolio," the March 27, 2020 press release stated that Tassili had "filed four provisional patents"[5] and "intends to demonstrate that the clinical and physiological effectiveness in PTSD and obsessive-compulsive disorder (OCD) are enhanced by the timely measured dosages of psilocybin and cannabidiol, with superior clinical results as measured by objective outcomes."

36. The same section of the press release further stated:

> Management's **vision** is to administer a proven and proprietary combination of psilocybin and CBD in certified drug as well as psychotherapeutic clinics once human clinical trials are completed and the combination is approved by applicable regulatory agencies.
>
> Management also **believes that increased specificity to ensure approved, appropriate, standardized and dignified methods of treatment will result** from novel delivery systems suiting recovery

---

[5] A provisional patent "provides the means to establish an early effective filing date in a later filed nonprovisional patent application" but can be filed "without a formal patent claim, oath or declaration, or any information disclosure (prior art) statement," which are necessary elements of a nonprovisional patent application. https://www.uspto.gov/patents/basics/types-patent-applications/provisional-application-patent. However, the applicant must file a nonprovisional patent application within 12 months of filing the provisional application to benefit from the earlier filing date. *Id.* The provisional patent application is "intended to give an inventor time to pitch the idea, test its commercial feasibility, or refine a product before committing to the expensive and time-intensive process of formal application." https://www.investopedia.com/terms/p/provisional-patent-application.asp. Thus, the filing of a provisional patent application does not by itself yield a patent.

solutions to specific indications. Three of the Company's provisional patents relate to this important part of the drug to patient relationship.[6]

37. Therefore, although Tassili existed for about two years prior to the acquisition, it had no intellectual property or proven results of the clinical effect of psilocybin that could potentially be developed into a commercial product.

38. Champignon would "acquire 100% of the issued and outstanding shares of Tassili for total consideration of 16 million common shares in the capital of the Company," and a finder's fee was applicable to the transaction. The transaction closed on March 27, 2020 for a purchase value of $5,075,000.

### d) AltMed Capital Corp.

39. On April 9, 2020, Champignon issued a press release announcing that it had entered into a definitive agreement to acquire AltMed Capital Corp. ("AltMed"), "a Canadian ketamine clinic operator, psychedelic medicine IP aggregator and novel drug discoverer." AltMed "ha[d] a suite of assets that will accelerate Champignon's multi-pronged business strategy, enabling Champignon to reach the consumer directly via rapid onset medical treatments." AltMed's CEO, Dr. Roger McIntyre, was a significant shareholder of AltMed and is now Champignon's CEO.

40. AltMed owned 75% of the Canadian Rapid Treatment Centre of Excellence ("CRTCE"), which had 18 months of operating history as a "vertically integrated rapid onset treatment centre operating from proof-of-concept to human clinical trials and publication."

41. Following the acquisition, "Champignon and AltMed will begin to roll out a network of subspecialty therapeutic clinics as a complementary, follow-on service for individuals and families who are suffering from the effects of addiction, depression, PTSD and anxiety disorders." The CRTCE "plans to expand its clinical

---

[6] All emphasis is added unless otherwise stated.

footprint via the establishment of NCEs for ketamine, psilocybin and MDMA, as well as pursue partnerships with the broader pharmaceutical industry."

42. Champignon would "acquire 100% of the issued and outstanding shares of AltMed for total consideration of 55,124,000 common shares . . . in the capital of the company," which were subject to certain holding and resale restrictions. Champignon would also issue 3,391,500 share purchase warrants in exchange for the cancellation of outstanding exercised AltMed share purchase warrants. A finder's fee was also applicable to this transaction.

43. On April 30, 2020, Champignon announced that it had closed its acquisition of AltMed. In the same press release, the Company announced that AltMed had purchased the outstanding shares of CTRCE and now owned 100% of the center. Two weeks later, on May 11, 2020, Champignon announced that Defendant McIntyre was appointed the CEO of the Company.

**2. Champignon Conceals That The Brother Of Its CEO, Who Was A Consultant Of The Company, Owned Each Of These Four Entities, Making Them All Related Party Transactions**

44. These four transactions shared one commonality: they secretly led to financial windfalls for Lucas Birdsall, the older brother of Champignon's CEO Gareth Birdsall. Not only was Lucas Birdsall an undisclosed consultant of Champignon and a significant shareholder of the Company, but he was a part owner in all four of the acquired companies. In fact, in just these four transactions, Lucas Birdsall was enriched by more than $7.9 million in cash and shares for consulting fees, stock options, and compensation.

45. As the Company subsequently admitted, these acquisitions were related party transactions because Lucas Birdsall was a significant shareholder of and consultant for Champignon, he wielded significant influence over the Company, and he was owner of the acquisition targets. Champignon was obligated to disclose this fact under the governing accounting rules and regulations yet failed to do so.

## B. Relevant Accounting Principles

46. Champignon purported to prepared its consolidated financial statements in accordance with International Financial Reporting Standards ("IFRS"), as issued by the International Accounting Standards Board (IASB). IFRS, comprised of principles, conventions, rules, and procedures, are globally accepted accounting standards specifying how accounts must be maintained and reported. IFRS has been adopted by more than 144 countries, and is equivalent in nature to U.S. Generally Accepted Accounting Principles ("GAAP") in the United States. "International Accounting Standards" ("IAS"), issued by IASB's predecessor, were adopted by IASB and remain part of IFRS.

### 1. Asset Acquisitions, Unlike Business Acquisitions, Do Not Result In The Recognition Of Goodwill

47. IFRS 3 is the relevant standard that establishes how an acquirer measures the assets, liabilities, and goodwill purchased in a business combination, which is defined as "a transaction or event in which an acquirer obtains control of one or more businesses."

48. IFRS 3 does not apply to the acquisition of an asset or a group of assets that does not constitute a business. In that case, the acquirer must account for the transaction as an asset acquisition. The acquirer must "identify and recognise the individual identifiable assets acquired (including those assets that meet the definition of, and recognition criteria for, intangible assets in IAS 38 Intangible Assets) and liabilities assumed." Then, "[t]he cost of the group [i.e., the purchase price] shall be allocated to the individual identifiable assets and liabilities on the basis of their relative fair values at the date of purchase." Notably, "[s]uch a transaction or event does not give rise to goodwill."

49. Paragraphs B5-B12D of IFRS 3 provide guidance on identifying a business combination and the definition of a business. Paragraph B7 states that a "business consists of inputs and processes applied to those inputs that have the

ability to contribute to the creation of outputs." It further identifies the three elements of a business:

(a) **Input**: Any economic resource that creates outputs, or has the ability to contribute to the generation of outputs when one or more processes are applied to it. Examples include non-current assets (including intangible assets or rights to use non-current assets), intellectual property, the ability to obtain access to necessary materials or rights and employees.

(b) **Process**: Any system, standard, protocol, convention or rule that when applied to an input or inputs, creates outputs or has the ability to contribute to the creation of outputs. Examples include strategic management processes, operational processes and resource management processes. These processes are typically documented, but the intellectual capacity of an organised workforce having the necessary skills and experience following rules and conventions may provide the necessary processes that are capable of being applied to inputs to create outputs. (Accounting, billing, payroll and other administrative systems typically are not processes used to create outputs.)

(c) **Output**: The result of inputs and processes applied to those inputs that provide goods or services to customers, generate investment income (such as dividends or interest) or generate other income from ordinary activities.

## 2. Related Party Relationships Must Be Disclosed

50. IAS 24 requires an entity to disclose related party relationships because they "could have an effect on the profit or loss and financial position of an entity." Such disclosures are required because "knowledge of an entity's transactions, outstanding balances, commitments, and relationships with related parties may affect assessments of its operations by users of financial statements, including assessments of the risks and opportunities facing the entity."

51. A related party "is a person or entity that is related to the entity that is preparing its financial statements" (i.e., the reporting entity). Moreover, IAS 24 provides that a "person or a close member of that person's family is related to a reporting entity if that person:

(i) has control or joint control of the reporting entity;

(ii) has significant influence over the reporting entity; or

AMENDED CLASS ACTION COMPLAINT

13

(iii) is a member of the key management personnel of the reporting entity or of a parent of the reporting entity."

52. Here, Defendants admitted (after the Class Period) that all four of the acquisitions were related party transactions because Champignon had a consulting agreement with Lucas Birdsall, the brother of the CEO of the Company, that Lucas Birdsall wielded significant influence over the Company, and that he had an ownership interest in the targets of the acquisitions. Specifically, Lucas Birdsall held: a 16.0% ownership interest in AGL and was issued 1.28 million Champignon shares worth $371,200 in connection with Champignon's acquisition of AGL; a 12.0% ownership interest in NFL and was issued 1.5 million Champignon shares worth $525,000 in connection with Champignon's acquisition of NFL; a 15.625% ownership interest in Tassili and was issued 3 million Champignon shares worth $912,500 in connection with Champignon's acquisition of Tassili; and a 7.9525% ownership interest in AltMed and was issued 6.018 million Champignon shares worth $5,356,020 in connection with Champignon's acquisition of AltMed. Through these transactions and his involvement with Champignon, Lucas Birdsall received more than $7.48 million in cash and shares for consulting fees, stock options and compensation.[7]

53. Since Lucas Birdsall was a related party under the relevant accounting guidelines, the Company was obligated to disclose his involvement in the four transactions. Yet, his involvement was never disclosed until after the Class Period.

---

[7] Lucas Birdsall also received $50,000 for consulting services and $268,121 in stock options.

### C. During The Class Period, Champignon Improperly Attributes Nearly All Of The Value Of The Acquisitions To Purported Intellectual Property

54. On May 29, 2020, Champignon filed its interim financial statements via SEDAR[8] for the six-month period ended March 31, 2020 (the "2Q20 Report"), reporting, among other things, the accounting for the acquisitions. It showed that the purchase price for each of the transactions had been almost entirely allocated to "intellectual property."

55. Absent from the report and the accompanying management's discussion and analysis ("MD&A") is any discussion of the formal methodological valuation used to measure the fair value of the "intellectual property." This glaring omission drew the attention of the British Columbia Securities Commission, which issued a cease trade order on June 22, 2020 suspending trading of Champignon's securities until the Company filed business acquisition reports for the acquisitions.

56. On this news, the Company's stock price fell 24% to close at $0.500 per share (USD) on June 22, 2020, on unusually heavy trading volume.

57. On July 21, 2020, the Company filed business acquisition reports for each of the acquisitions, revealing that none of the acquisitions held any intellectual property that Champignon could have plausibly purchased. Therefore, the "intellectual property" purportedly attributed to these companies refers to another intangible asset called goodwill, which is the excess of the purchase price over the assets and liabilities and represents the value of the brand of the business. As discussed *supra*, goodwill is recognized if the transaction constitutes a business combination, but not if it is an asset acquisition.

---

[8] System for Electronic Document Analysis and Retrieval ("SEDAR") is the system used for electronically filing required documents with the Canadian securities regulatory authorities.

58.     However, none of the acquired companies constitute a business under IFRS 3: as Champignon admitted on March 11, 2021, "the assets acquired were not an integrated set of activities with inputs, processes and outputs."  Moreover, AGL, NFL, and Tassili were nascent companies that offered little more than a means for Lucas Birdsall, the Company's CEO's brother, to enrich himself with shares, options, and compensation.

### 1.     AGL

59.     In the 2Q20 Report filed on May 29, 2020, Champignon reported that all of the purchase price ($2,904,000) for AGL had been allocated to unidentified "intellectual property."  It further stated that the "intellectual property is not yet ready for its intended use; therefore no amortization has been recorded as at March 31, 2020."  Specifically, it stated:

| Purchase price: | $ |
|---|---|
| 8,000,000 acquisition common shares | 2,640,000 |
| 800,000 finder common shares | 264,000 |
| Total consideration | 2,904,000 |
| | |
| Net assets acquired: | |
| Right-of-use asset (Note 10) | 11,077 |
| Lease liability (Note 10) | (11,077) |
| Intellectual property (Note 6) | 2,904,000 |
| Total net assets acquired | 2,904,000 |

60.     On July 21, 2020, Champignon filed a business acquisition report on Form 51-102F4 with SEDAR regarding the AGL acquisition (the "AGL Report"). It included a valuation report and purchase price allocation from RwE Growth Partners, Inc. dated July 6, 2020, which found that "the most appropriate means of determining the fair value of AGL, at the time of its acquisition by the Company, was to rely upon the consideration offered by the Company."

61. The AGL Report included the audited financial statements "for the period from incorporation on September 9, 2019 to February 29, 2020." The balance sheet stated that as at February 29, 2020, AGL had $13,981 in total assets: $2,558 held as a deposit; $11,422 representing a right-of-use asset; and **$1 in intellectual property**. AGL had total liabilities of $37,010. Moreover, since its incorporation, AGL generated $0 in revenue and incurred a net loss of $23,039, primarily in the form of depreciation expenses. The right-of-use asset, related lease liability, and depreciation expenses related to the lease of a mushroom cultivation facility in British Columbia that matured on August 1, 2020.

62. The financial statement stated that the nominal "[i]ntellectual property consists of know-how [but it] is not yet ready for its intended use and as such, no amortization has been recorded as of February 29, 2020."

63. The financial statements attached to the AGL Report noted that "[a]t February 29, 2020, [AGL] had not yet achieved profitable operations, has accumulated losses of $23,039 since its inception and expects to incur further losses in the development of its business, all of which **casts significant doubt about the Company's ability to continue as a going concern.**"

64. The AGL Report subtly corrected the description of AGL. In announcing the acquisition, Champignon had claimed that AGL was a "mushroom cultivator and supplier." However, the AGL Report states that AGL "leases a cultivation facility **intended to produce** an assortment of organic craft mushroom varietals." That is, Champignon appeared to concede that AGL is not yet a supplier, and is thus not an actual *business* for accounting purposes that the Company acquired.

### 2. NFL

65. In the 2Q20 Report, Champignon reported that 99.7% of the purchase price for NFL had been allocated to unidentified "intellectual property." It further

stated that the "intellectual property is not yet ready for its intended use; therefore no amortization has been recorded as at March 31, 2020." Specifically, it stated:

| | $ |
|---|---|
| Purchase Price: | |
| 12,500,000 acquisition common shares | 3,625,000 |
| 1,000,000 finder common shares | 290,000 |
| Total consideration | 3,915,000 |
| | |
| Net assets acquired: | |
| Inventory | 10,000 |
| Intellectual property (Note 6) | 3,905,000 |
| Total net assets acquired | 3,915,000 |

66. On July 21, 2020, Champignon filed a business acquisition report on Form 51-102F4 with SEDAR regarding the NFL acquisition (the "NFL Report"). It included a valuation report and purchase price allocation from RwE Growth Partners, Inc. dated July 6, 2020, which found that "the most appropriate means of determining the fair market value of NFL, at the time of its acquisition by the Company, was to rely upon the consideration offered by the Company."

67. The NFL Report included the audited financial statements "for the period from incorporation on September 25, 2019 to February 29, 2020." The balance sheet stated that, as at February 29, 2020, NFL had $10 in assets held in the form of cash, indicating that NFL lacked any intellectual property. Moreover, since its incorporation, NFL generated $0 revenue and incurred $5,260 in expenses (consisting of "research costs").

68. The financial statements attached to the NFL Report noted that "[a]t February 29, 2020, [NFL] had not yet achieved profitable operations, has accumulated losses of $5,260 since its inception and expects to incur further losses in the development of its business, all of which *casts significant doubt about [NFL's] ability to continue as a going concern.*"

### 3. Tassili

69. In the 2Q20 Report, Champignon reported that 97.3% of the purchase price for Tassili had been allocated to unidentified "intellectual property." It further stated that the "intellectual property is not yet ready for its intended use; therefore, no amortization has been recorded at March 31, 2020." Specifically, it stated:

| | $ |
|---|---|
| Purchase price: | |
| 16,000,001 acquisition common shares | 4,640,000 |
| 1,500,000 finder common shares | 435,000 |
| Total consideration | 5,075,000 |
| | |
| Net assets acquired: | |
| Cash | 9,621 |
| Sales tax receivable | 125,846 |
| Intellectual property (Note 6) | 4,939,533 |
| Total net assets acquired | 5,075,000 |

70. On July 21, 2020, Champignon filed a business acquisition report on Form 51-102F4 with SEDAR regarding the Tassili acquisition (the "Tassili Report"). It included a valuation report and purchase price allocation from RwE Growth Partners, Inc. dated July 6, 2020, which found that "[u]sing a weighted historical transactional method of valuation, . . . the fair market value of [Tassili], at the time of its acquisition by the Company, was $4,900,000."

71. The Tassili Report included the audited financial statements for the fiscal year ended December 31, 2019 and from incorporation on March 13, 2018 to December 31, 2018. As of December 31, 2019, Tassili had assets of $3,395 (consisting of $3,378 in cash and $17 in sales tax receivable), indicating that Tassili lacked any intellectual property. It had $8,419 in current liabilities, in the form of accounts payable and accrued liabilities. Moreover, since its incorporation in March 2018, Tassili generated $0 revenue and incurred a net loss of $100; for the year

ended December 31, 2019, Tassili incurred a net loss of $25,927 in expenses, mostly professional fees and consulting fees.

72. The financial statements attached to the Tassili Report noted that "[a]t December 31, 2019, [Tassili] had not yet achieved profitable operations, has accumulated losses of $26,027 since its inception and expects to incur further losses in the development of its business, all of which *casts significant doubt about [Tassili's] ability to continue as a going concern.*"

**D. The British Columbia Securities Commission Issued Replacement Cease Trade Orders Pending Champignon's Filing Of Additional Reports**

73. On September 15, 2020, Champignon issued a press release announcing that the British Columbia Securities Commission had revoked the cease trade order issued in June after the Company filed the business acquisition reports for AGL, NFL, and Tassili. The Company also announced that "the Commission issued a replacement cease trade order . . . pending the filing of a revised material change report . . . in connection with the acquisition by the Company of AltMed."

74. In the September 15, 2020 press release, the Company further stated that the material change report filed on May 11, 2020 for the AltMed acquisition would be revised because, among other things, "the acquisition of AltMed should be treated as a reverse-takeover in accordance with IFRS 3 – *Business Combinations*."

75. On October 29, 2020, Champignon provided an update on the continuous disclosure review by the British Columbia Securities Commission, stating that it had "submitted all requested documentation to the Commission in connection with the review of financial statements of AltMed Capital Corp. . . . for the period ended June 30, 2020, and subject to review by the Commission expects to move forward with the finalization and public filing of these statements in short order." Moreover, the Company announced "an additional cease trade order [by the Commission] ending the filing of the interim financial statements of the Company for the period ended June 30, 2020."

**E.    The Company Eventually Is Compelled To Disclose The Acquisitions Were All Related Party Transactions And Admit That The Accounting For The Acquisitions Was Improper Because As The Assets Did Not Meet The Definition Of Intangible Assets**

76.    Lucas Birdsall's involvement was never disclosed during the Class Period.

77.    On February 17, 2021, Champignon issued a press release revealing, among other things, that "a shareholder and contracted consultant . . . of the Company was a related party with respect to the Acquisitions." As a result, the financial statements and MD&A would "include additional disclosure details with respect to related party transactions involving the Consultant." It still did not identify the related party.

78.    The same press release noted that Champignon would restate its financial results for the three and six month periods ended March 31, 2020. Specifically, "the Company previously recognized intangible assets in connection with the [A]cquisitions . . . that aggregated to approximately $12 million." The restatement would "correct the accounting for the Acquisitions as the assets do not meet the definition of intangible assets for the purposes of international financial reporting standards and as a result will be recorded as transaction costs in the Company's statement of loss and comprehensive loss."

79.    On this news, the Company's stock price fell 10.8% to close at $0.687 (USD) per share on February 17, 2021, on unusually heavy trading volume.

80.    On March 11, 2021, the Company finally identified the related party to the acquisitions: Lucas Birdsall. In the restated financial statements for 2Q20 (the "Restated 2Q20 Report"), the Company stated:

> The Company has also identified a significant shareholder and contracted consultant of the Company (the "Consultant") as a related party for reporting purposes as the Consultant exerted significant influence over the Company. The Consultant was also a shareholder of Artisan Growers, Novo [NFL] and Tassili and was issued common shares of the Company for these three acquisitions (Notes 3 and 9). In addition, the Consultant was paid $20,000 and issued 1,400,000 options

AMENDED CLASS ACTION COMPLAINT

21

to acquire common shares of the Company during the six month period ended March 31, 2020.

The MD&A accompanying the Restated 2Q20 Report identified this Consultant as Lucas Birdsall, Defendant Gareth Birdsall's brother. The consulting agreement was terminated in November 2020.

81. The Restated 2Q20 Report also restated the accounting of the acquisitions, effectively reporting that the value of the "intellectual property" in the acquisitions is zero. The MD&A stated that "management concluded that none of the Company's acquisitions . . . represented a business, as the assets acquired were not an integrated set of activities with inputs, processes and outputs." As a result, the acquisitions "represented the purchase of assets, [and] there was no goodwill generated on the transactions and acquisition costs were capitalized to the assets rather than expensed."

82. In the restated financials, Defendants admitted that Champignon had paid certain consideration in excess of the fair value of the asset acquisitions: specifically, Champignon paid $2,577,488 in excess of the net liabilities acquired in the AGL acquisition, $4,724,990 in excess of the net assets acquired in the NFL acquisition, and $6,214,536 in excess of the identifiable assets acquired in the Tassili acquisition. These excess amounts were expressed in the statement of loss and comprehensive loss. Specifically, for AGL, the Restated 2Q20 Report stated:

| Purchase price: | $ |
|---|---|
| 8,000,000 acquisition common shares (Note 9) | 2,320,000 |
| 800,000 finder common shares (Note 9) | 232,000 |
| Total consideration | 2,552,000 |
| | |
| Net liabilities acquired: | |
| Cash | 10 |
| Right-of-use asset (Note 10) | 11,077 |
| Accounts payable | (25,498) |
| Lease liability (Note 10) | (11,077) |
| Total net liabilities acquired | (25,488) |
| Consideration paid in excess of net liabilities acquired | (2,577,488) |

A shareholder and contracted consultant to the Company was also a shareholder of Artisan Growers and was issued 1,280,000 common shares of the Company on the closing of the acquisition of Artisan Growers (Note 8).

AMENDED CLASS ACTION COMPLAINT

22

83. For NFL, the Restated 2Q20 Report stated:

| Purchase Price: | $ |
|---|---|
| 12,500,000 acquisition common shares (Note 9) | 4,375,000 |
| 1,000,000 finder common shares (Note 9) | 350,000 |
| Total consideration | 4,725,000 |
| | |
| Net assets acquired: | |
| Cash | 10 |
| Total net assets acquired | 10 |
| Consideration paid in excess of net assets acquired | (4,724,990) |

A shareholder and contracted consultant to the Company was also a shareholder of Novo and was issued 1,500,000 common shares of the Company on the closing of the acquisition of Novo (Note 8).

84. For Tassili, the Restated 2Q20 Report stated:

| Purchase price: | $ |
|---|---|
| 16,000,001 acquisition common shares (Note 9) | 5,840,000 |
| 1,500,000 finder common shares (Note 9) | 547,500 |
| Total consideration | 6,387,500 |
| | |
| Net assets acquired: | |
| Cash | 9,622 |
| Account receivable | 37,496 |
| Sales tax receivable | 125,846 |
| Total net assets acquired | 172,964 |
| Consideration paid in excess of identifiable assets acquired | (6,214,536) |

A shareholder and contracted consultant to the Company was also a shareholder of Tassili and was issued 2,500,000 common shares of the Company on the closing of the acquisition of Tassili (Note 8).

85. The Restated 2Q20 Report also revealed that the acquisitions must be accounted for as asset acquisitions, and thus no goodwill was acquired:

> Judgment is required to determine if the Company's acquisition represented a business combination or asset acquisitions. More specifically, **management concluded that none of the Company's acquisitions, outlined in note 3, represented a business, as the assets acquired were not an integrated set of activities with inputs, processes and outputs.** Since it was concluded that the acquisitions represented the purchase of assets, there was no goodwill generated on the transactions and acquisition costs were capitalized to the assets purchased rather than expensed. As the Company concluded that the acquisitions were asset acquisitions, an allocation of the purchase price to the individual identifiable assets acquired, including intangible assets, and liabilities assumed based on their fair values at the date of purchase were required.

86. That none of the purchase prices of the acquisitions could be allocated to any intellectual property is an admission that a valuation expert could not attach a fair market value to any purported intellectual property owned by the acquired target

AMENDED CLASS ACTION COMPLAINT

23

companies. The restatement further acknowledges that Champignon overpaid vast sums for nominal assets, implying that much of the consideration was a means to divert funds to Lucas Birdsall.

87. The MD&A accompanying the Restated 2Q20 Report identified the "following material values and disclosure assigned to" them:

- Reduced intangible assets from $11,860,462 to $111,929;
- Increase of share capital from $15,603,227 to $17,373,727;
- Increase of deficit from $3,089,025 to $16,643,536;
- Additional related party disclosure

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

88. Throughout the Class Period, Defendants were aware or were reckless in not knowing that companies acquired by Champignon had been owned by the brother of the Company's CEO and that the Company had improperly accounted for these transactions by treating them as businesses and claiming they had intellectual property. Yet, Defendants failed to disclose that these were related party transactions and that the Company had treated the excess amounts paid in the transactions as intangible assets in violation of accounting rules, which necessitated a restatement of the Company's financial results.

89. On March 27, 2020, Defendants issued a press release entitled "Champignon Expands Preclinical Pipeline With Measured Psilocybin Dosages Studies at University of Miami," which stated, in relevant part:

> Champignon Brands Inc. ("Champignon" or the "Company") (CSE: SHRM) (FWB: 496) (OTC: SHRMF), a health and wellness company specializing in the formulation of medicinal mushrooms health products and novel delivery platforms for the pharmaceutical and nutraceutical industries, has entered into a definitive agreement to acquire Tassili Life Sciences Corp. ("Tassili"), expanding the Company's preclinical trial pipeline, as well as its aggregation of broad intellectual property (IP) related to the development of novel psychedelics therapeutics and their delivery systems, targeting multiple pathological psychological diseases.

Tassili, in partnership with a multidisciplinary team of scientists and physicians at the University of Miami are working to develop effective psilocybin-based therapeutics for the treatment of mild traumatic brain injuries (mTBI) and/or post-traumatic stress disorder (PTSD).

90. Also on March 27, 2020, the Company filed a filed a Material Change Report on Form 51-102F3 with the Canadian securities regulatory authorities which stated the following, in pertinent part, regarding the Company's acquisition of AGL: "The Company is pleased to announce it has entered into a definitive agreement (the 'Agreement') to acquire Artisan Growers Ltd. ('Artisan Growers'), a British Columbia based craft mushroom cultivator and supplier."

91. Attached to the March 27, 2020 Material Change Report on Form 51-102F3 with the Canadian securities regulatory authorities was a press release by the Company which, in relevant part, stated:

Under the terms of the Agreement, Champignon will acquire 100 percent of the issued and outstanding shares of Artisan Growers for total consideration of 8 million common shares in the capital of the Company (the "Consideration Shares"). The Consideration Shares will be issued at an attributed price equal to a five-thy volume-weighted average price at the time of issuance. A finder's fee is applicable to this transaction

92. The above March 27, 2020 statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Lucas Birdsall, the brother of the Company's CEO, was an owner of Tassili and AGL that as such, these were related party transactions.

93. On March 30, 2020, Champignon, filed a Material Change Report on Form 51-102F3 with the Canadian securities regulatory authorities which, in relevant part, stated:

The Issuer introduces new proprietary intellectual property ("IP") into its vertically integrated alternative medicine product range. The Company is pleased to announce its entry into a definitive agreement,

AMENDED CLASS ACTION COMPLAINT

25

signed March 18, 2020, to acquire Novo Formulations Ltd. ('Novoformulations').

94. Attached to the March 30, 2020 Material Change Report on Form 51-102F3 was a press release by the Company which stated the following, in pertinent part, regarding the Company and its acquisition of NFL:

> Under the terms of the Agreement, Champignon will acquire 100 percent of the issued and outstanding shares of Novoformulations for total consideration of 12.5 million common shares in the capital of the Company at a deemed price of $0.2475 per share. A finder's fee is applicable to this transaction.

95. The above March 30, 2020 statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Lucas Birdsall, the brother of the Company's CEO, was an owner of NFL and that as such, it was a related party transaction.

96. On April 9, 2020, Defendants issued a press release entitled "Champignon to Acquire AltMed Capital Corp., Contributing Health Canada's Only Approved Psychedelic Medicine Clinic, SOPs for Clinical Expansion, Existing IP & Multiple Trials," which stated, in relevant part:

> Champignon Brands Inc. ("Champignon" or the "Company") (CSE: SHRM) (FWB: 496) (OTC: SHRMF), a human optimization sciences company focused on applying novel and natural treatment protocols to address a broad range of disorders and deficiencies with an emphasis on psychedelic medicine, continues to accelerate its advancements within the psychedelic medicine arena via the acquisition of a leading Canadian ketamine clinic operator, psychedelic medicine IP aggregator and novel drug discoverer (the "Transaction"). To this extent, the Company is pleased to announce that it has entered into a definitive agreement (the "Agreement") to acquire 100% of AltMed Capital Corp. ("AltMed").

> \* \* \*

> AltMed is a Canadian ketamine clinic operator, psychedelic medicine IP aggregator and novel drug discoverer. AltMed has a suite of assets that will accelerate Champignon's multi-pronged business strategy, enabling Champignon to reach the consumer directly via rapid onset medical treatments, with an anticipated rollout of new clinical entities

(NCEs) already identified and to be opened across the United States and Canada. Five new clinics in key markets, including New York, Florida and California, are anticipated to be fully operational by Q4 2020.

97. The above April 9, 2020 statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Lucas Birdsall, the brother of the Company's CEO, was an owner of AltMed and that as such, it was a related party transaction.

98. On April 30, 2020, Defendants issued a press release entitled "Champignon Ketamine Treatment to be Dispensed by Major Canadian Pharmacy Chain; Closes AltMed," which stated, in relevant part:

> Additionally, Champignon is pleased to announce that it has closed its acquisition of AltMed Capital Corp. ("AltMed"), subject to the submission of the necessary filings to the BC Corporate Registry and including any other necessary regulatory approvals.

> AltMed is a Canadian ketamine clinic operator, psychedelic medicine IP aggregator and novel drug discoverer. AltMed has a suite of assets that will accelerate Champignon's multipronged business strategy, enabling the Company to reach the consumer directly through rapid-onset medical treatments, with an anticipated rollout of new clinical entities (NCEs) already identified and to be opened across the United States and Canada.

> Furthermore, the Company reports that AltMed has purchased the balance of the shares of the Canadian Rapid Treatment Centre of Excellence Inc. ("CRTCE"), resulting in a 100% ownership of the CTRCE by AltMed and replacing the originally contemplated retained interest in CRTCE to be held by its principals.

99. The above April 30, 2020 statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Lucas Birdsall, the brother of the Company's CEO, was an owner of AltMed and that as such, it was a related party transaction.

100. On May 11, 2020, Defendants filed a material change report via SEDAR regarding the AltMed acquisition, which stated, in relevant part:

The Company completed the acquisition all of the issued and outstanding securities of Altmed Capital Corp. ("Altmed") in exchange for 75,674,000 shares the Company and 2,100,000 share purchase warrants exercisable into common shares of the Company at a price of $0.25 expiring February 20, 2022. AltMed owns 100% Canadian Rapid Treatment Center of Excellence Inc., the owner of a fully operational clinic located in Mississauga, Ontario, with over 18 months of operating history ("CRTCE"). CRTCE is licensed by the College of Physicians and Surgeons Ontario (CPSO) under OHPP (Out of Hospital Premise Program) to administer ketamine treatments for indications including but not limited to depression, bipolar disorder, post-traumatic stress disorder (PTSD) and obsessive-compulsive disorder (OCD). The CRTCE also serves as a rapid onset treatment training and education center for medical professionals and is equipped with a co-located pharmacy. The clinic has been licensed by Health Canada to dose eligible patients with psilocybin and is the only clinic in Canada to perform psilocybin doses under Health Canada approval. The Company paid a finders fee of 2,000,000 common shares.

101. The above May 11, 2020 statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that Lucas Birdsall, the brother of the Company's CEO, was an owner of AltMed and that as such, it was a related party transaction.

102. On May 29, 2020, Defendants filed the interim financial statements for the six-month period ended March 31, 2020 via SEDAR (the "2Q20 Report"). It stated that AGL had been accounted as a purchase of an asset:

On March 17, 2020, the Company acquired a 100% interest in Artisan Growers Ltd. ("Artisan Growers"). Artisan Growers is a British Columbia based craft mushroom research and cultivation company.

The acquisition has been accounted as a purchase of an asset (Note 2) and a summary is as follows:

| Purchase price: | $ |
|---|---|
| 8,000,000 acquisition common shares | 2,640,000 |
| 800,000 finder common shares | 264,000 |
| Total consideration | 2,904,000 |
| | |
| Net assets acquired: | |
| Right-of-use asset (Note 10) | 11,077 |
| Lease liability (Note 10) | (11,077) |
| Intellectual property (Note 6) | 2,904,000 |
| Total net assets acquired | 2,904,000 |

The intellectual property is not yet ready for its intended use; therefore, no amortization has been recorded as at March 31, 2020.

AMENDED CLASS ACTION COMPLAINT

28

103. The 2Q20 Report also stated NFL had been accounted as a purchase of an asset:

On March 20, 2020, the Company acquire a 100% interest in Novo Formulations Ltd. ("Novo"). Novo is a research and development company developing novel and innovative delivery systems for the pharmaceutical and nutraceutical industries.

The acquisition has been accounted as a purchase of an asset (Note 2) and a summary is as follows:

| | $ |
|---|---|
| Purchase Price: | |
| 12,500,000 acquisition common shares | 3,625,000 |
| 1,000,000 finder common shares | 290,000 |
| Total consideration | 3,915,000 |
| | |
| Net assets acquired: | |
| Inventory | 10,000 |
| Intellectual property (Note 6) | 3,905,000 |
| Total net assets acquired | 3,915,000 |

The intellectual property is not yet ready for its intended use; therefore, no amortization has been recorded as at March 31, 2020.

104. The 2Q20 Report also stated that Tassili had been accounted as a purchase of an asset:

On March 27, 2020, the Company acquired a 100% interest in Tassili Life Sciences Corp. ("Tassili"). Tassili is a research and development Company partnered with a multidisciplinary team of scientists and physicians at the University of Miami and are working to develop effective psilocybin-based therapeutics for the treatment of mild traumatic brain injuries and post traumatic stress disorder.

The acquisition has been accounted as a purchase of an asset (Note 2) and a summary is as follows:

| | $ |
|---|---|
| Purchase price: | |
| 16,000,001 acquisition common shares | 4,640,000 |
| 1,500,000 finder common shares | 435,000 |
| Total consideration | 5,075,000 |
| | |
| Net assets acquired: | |
| Cash | 9,621 |
| Sales tax receivable | 125,846 |
| Intellectual property (Note 6) | 4,939,533 |
| Total net assets acquired | 5,075,000 |

The intellectual property is not yet ready for its intended use; therefore, no amortization has been recorded as at March 31, 2020.

105. The above statements on May 29, 2020 regarding the AGL, NFL and Tassili transactions were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that: (1) these were all related party transactions; (2) though Champignon claimed the AGL, NFL, and Tassili acquisitions were purchases of assets, the Company had improperly accounted for these transactions by treating them as businesses and claiming they had intellectual property; (3) that the Company had treated the excess amounts paid in the transactions as intangible assets in violation of accounting rules; (4) that as a result of these accounting violations, the Company would need to restate its financial results; and (5) as a result, Defendants' public statements attesting to the Company's financial condition were materially false and misleading at all times.

106. Under "Related party transactions and balances," the 2Q20 Report stated:

The Company has identified its Directors and certain senior Officers as its key management personnel.

Key management compensation consist of the following for the period from March 26, 2019 (incorporation) to March 31, 2019 and for the six month period ended March 31, 2020:

|  | March 31, 2020 $ | March 31, 2019 $ |
| --- | --- | --- |
| Consulting fees charged by the CEO | 35,000 | - |
| Consulting fees charged by the CFO | 7,500 | - |
| Share-based compensation | 69,456 | - |
|  | 111,956 | - |

Included in accounts payable and accrued liabilities at March 31, 2020 is $1,575 (September 30, 2019 - $31,500) owed to related parties. This amount is due on demand, unsecured, and without interest.

107. The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose: (1) that Lucas Birdsall was a related party under relevant accounting regulations because he was the CEO's brother and wielded significant influence over the Company; (2) that Lucas Birdsall had received compensation as a consultant of Champignon; (3) that Lucas Birdsall had

an ownership interest in each acquisition target, and as such, the acquisitions were related party transactions; and (4) that Lucas Birdsall received shares of Champignon in connection with the acquisitions.

108. Also on May 29, 2020, Defendants filed the MD&A accompanying the 2Q20 Report, which stated regarding "Related Party Transactions:"

**Related Party Transactions**

The Directors and Executive Officers of the Company are as follows:
Roger McIntyre, CEO
Matthew Fish, President, Secretary and Director
Stephen Brohman, CFO
Gareth Birdsall, Director
Jerry Habuda, Director
Dr. Bill Wilkerson, Director
Pat McCutcheon, Director

The aggregate value of transactions and outstanding balances relating to key management personnel were as follows:

|  | For the period ended March 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Consulting fees paid or accrued to companies controlled by the CEO | $ 35,000 | $ - |
| Consulting fees paid or accrued to companies controlled by the CFO | 7,500 | - |
| Share based compensation | 69,456 | - |
| Total | $ 111,956 | $ - |

Included in accounts payable and accrued liabilities is $1,575 (September 30, 2019 - $46,500) payable to directors and officers of the Company.

109. The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose: (1) that Lucas Birdsall was a related party under relevant accounting regulations because he was the CEO's brother and wielded significant influence over the Company; (2) that Lucas Birdsall had received compensation as a consultant of Champignon; (3) that Lucas Birdsall had an ownership interest in each Acquisition target, and as such, the Acquisitions were related party transactions; and (4) that Lucas Birdsall received shares of Champignon in connection with the Acquisitions.

110. On June 22, 2020, Champignon issued a press release entitled "CHAMPIGNON ANNOUNCES REGULATORY REVIEW." The press release, in relevant part, stated that:

[Champignon had] been selected for a continuous disclosure review by the British Columbia Securities Commission (the "Commission"). The review relates to the Company's disclosure obligations since it became a reporting issuer on February 6, 2020 and includes a review of the disclosure surrounding certain recent acquisitions completed by the Company.

\* \* \*

In connection with the review, the Commission has issued a cease trade order suspending trading in the securities of the Company pending the filing of business acquisition reports by the Company in connection with the acquisitions of Artisan Growers Ltd., Novo Formulations Ltd and Tassili Life Sciences Corp.

111. The above statements on June 22, 2020 regarding the AGL, NFL and Tassili transactions were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that: (1) these were all related party transactions; (2) though Champignon claimed the AGL, NFL, and Tassili acquisitions were purchases of assets, the Company had improperly accounted for these transactions by treating them as businesses and claiming they had intellectual property; (3) that the Company had treated the excess amounts paid in the transactions as intangible assets in violation of accounting rules; (4) that as a result of these accounting violations, the Company would need to restate its financial results; and (5) as a result, Defendants' public statements attesting to the Company's financial condition were materially false and misleading at all times.

112. On September 15, 2020, Champignon issued a press release entitled "CHAMPIGNON PROVIDES UPDATE ON DISCLOSURE REVIEW" which provided the following regarding the AltMed acquisition and the cease trade orders:

In connection with the review, on June 19, 2020, the Commission issued a cease trade order suspending trading in the securities of the Company pending the filing of Business Acquisition Reports in

AMENDED CLASS ACTION COMPLAINT

32

connection with the acquisitions of Artisan Growers Ltd., Novo Formulations Ltd. and Tassili Life Sciences Corp. As a result of the cease trade order, trading in the common shares of the Company was suspended on the Canadian Securities Exchange.

The Business Acquisition Reports were filed by the Company on July 21, 2020, during which time the Company continued to work with the Commission to address comments received in the course of the disclosure review. As a result of the filing of the Business Acquisition Reports, on August 26, 2020, the Commission revoked the cease trade order previously issued on June 19, 2020. Concurrently with the revocation, the Commission issued a replacement cease trade order (the "Replacement Order"), pending the filing of a revised material change report (the "Material Change Report") in connection with the acquisition by the Company of AltMed.

*        *        *

Prior to finalization of a revised Material Change Report, the Company is required to finalize the accounting treatment for the acquisition of AltMed. The Company has concluded, in discussions with its external auditor and accounting advisors, that the acquisition of AltMed should be treated as a reverse-takeover in accordance with IFRS 3 — Business Combinations. As a result of this conclusion, AltMed is treated as the acquiror for accounting purposes and the Company is in the process of compiling the financial statements of AltMed for the six month period ended June 30, 2020 to meet disclosure requirements.

113. The above statements on September 15, 2020 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that: (1) that the four transactions, including the AltMed acquisition, were all related party transactions; (2) though Champignon claimed the AGL, NFL, and Tassili acquisitions were purchases of assets, the Company had improperly accounted for these transactions by treating them as businesses and claiming they had intellectual property; (3) that the Company had treated the excess amounts paid in the transactions as intangible assets in violation of accounting rules; (4) that as a

AMENDED CLASS ACTION COMPLAINT

33

result of these accounting violations, the Company would need to restate its financial results; and (5) as a result, Defendants' public statements attesting to the Company's financial condition were materially false and misleading at all times.

## VI. LOSS CAUSATION AND DISCLOSURES AFTER THE CLASS PERIOD

114. During the Class Period, Plaintiff and the Class purchased Champignon's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

115. Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Champignon's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

116. The truth regarding Champignon's related party acquisitions and/or the true status of the Company's accounting for these acquisitions was partially revealed, and/or the concealed risks materialized, on or about: June 22, 2020 and February 17, 2021.

117. On June 22, 2020, the Company issued a press release entitled, "Champignon Announces Regulatory Review." Therein, the Company, in relevant part, stated:

> Champignon Brands Inc. ("Champignon" or the "Company") (CSE: SHRM) (FWB: 496) (OTCQB: SHRMF) announces that it has been selected for a continuous disclosure review by the British Columbia Securities Commission (the "Commission"). The review relates to the Company's disclosure obligations since it became a reporting issuer on February 6, 2020 and includes a review of the disclosure surrounding certain recent acquisitions completed by the Company.

> "With the recent growth and interest in our industry, ensuring our disclosure obligations are satisfied is at the forefront of our attention.

Ensuring fulsome and timely disclosure is vital to the success of our Company, and development of our industry with the investing public. We look forward to working with staff of the British Columbia Securities Commission to complete their review, and are hopeful that trading will resume as soon as possible," commented Dr. Roger McIntyre, Chief Executive Officer of the Company.

In connection with the review, the Commission has issued a cease trade order suspending trading in the securities of the Company pending the filing of business acquisition reports by the Company in connection with the acquisitions of Artisan Growers Ltd., Novo Formulations Ltd. and Tassili Life Sciences Corp. As a result of the cease trade order, trading in the common shares of the Company has been suspended on the Canadian Securities Exchange.

The Company will fully cooperate with the Commission, to assist in completion of the review and revocation of the cease trade order in a timely fashion. The Company will provide further information regarding the status of the review, and the suspension of trading, as it becomes available.

118. On this news, the Company's stock price fell 24% to close at $0.500 per share (USD) on June 22, 2020, on unusually heavy trading volume.

119. On February 17, 2021, Defendants issued a press release entitled "Champignon Brands to Restate Financial Statements and MD&A has Prepared CSE Listing Statement." Therein, the Company, in relevant part, stated:

Champignon Brands Inc. (the "Company"), (CSE: SHRM) (FWB: 496) (OTCQB: SHRMF), announced that as a result of a review by the British Columbia Securities Commission (the "Commission"), the Company has determined to withdraw and refile its condensed interim consolidated financial statements and management's discussion & analysis ("MD&A") for the three and six month periods ended March 31, 2020 (the "Original Financial Statements and MD&A").

For the three and six month periods ended March 31, 2020, the Company previously recognized intangible assets in connection with the acquisitions of Artisan Growers Ltd., Novo Formulations Ltd. and Tassili Life Sciences Corp. (the "Acquisitions") that aggregated approximately $12 million. Subsequent to the issuance of the Original Financial Statements and MD&A, management determined that the financial statements needed to be restated to correct the accounting for the Acquisitions as the assets do not meet the definition of intangible assets for the purposes of international financial reporting standards and as result will be recorded as transaction costs in the Company's statement of loss and comprehensive loss. The restated condensed interim consolidated financial statements and MD&A will reflect this change in the accounting treatment of the assets acquired in these acquisitions. The effect of the restatements does not impact the Company's cash position.

AMENDED CLASS ACTION COMPLAINT
35

In addition, it was determined that a shareholder and contracted consultant (the Consultant") of the Company was a related party with respect to the Acquisitions. As a result, the restated condensed interim consolidated financial statements and MD&A will include additional disclosure details with respect to related party transactions involving the Consultant.

The Company also expects to concurrently file condensed interim consolidated financial statements and related MD&A's for the three months ended June 30, 2020 and for the six months ended September 30, 2020 (the "September Interim Financial Statements and MD&A"). The September Interim Financial Statements and MD&A will reflect the acquisition of Altmed Capital Corp. ("Altmed") on April 30, 2020 (the "Transaction"). The Transaction constituted a Reverse Takeover Transaction ("RTO") of Champignon by Altmed. As a result, the fiscal year end of the Company for accounting and reporting purposes subsequent to April 30, 2020 will be Altmed's fiscal year end of March 31.

120.     On this news, the Company's stock price fell 10.8% to close at $0.687 (USD) per share on February 17, 2021, on unusually heavy trading volume.

121.     During the Class Period, Plaintiff and the Class purchased Champignon securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

122.     The Individual Defendants acted with scienter by virtue of: (a) their knowledge of Lucas Birdsall's involvement in the four acquired companies; (b) their issuance of material misleading statements regarding the Company's accounting for the four transactions; and/or (c) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.  The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

123.     The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for

the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

**A. The Birdsall Family And Other Corporate Executives Profited Immensely From The Fraud**

124. As discussed above, Gareth Birdsall was able to use the Company as the means to enrich his brother, Lucas Birdsall. He was able to do this by having Champignon purchase his brother's companies at exorbitant prices while simultaneously failing to disclose Lucas's ownership interest or that Lucas was a consultant of Champignon. In total, the improper conduct resulted in Lucas Birdsall receiving compensation of more than $7.48 million. It defies credulity that Gareth did not know that his brother, Lucas, who was both a consultant and an individual with significant influence at the Company, was also an owner of the four acquired companies.

125. Stephen Brohman, the Company's CFO, was also able to reap a large windfall by selling 75% of his stock into the open market on May 15, 2020, when the stock's value was artificially inflated by the misstatements at issue:

| Shares Sold During CP | Gross Proceeds | Net Proceeds |
|---|---|---|
| 90,000 | $184,500 | $173,250 |

In comparison, Brohman only received $7,500 in salary during all of 2020 as the Company's CFO.

126. These millions of dollars provided a very real incentive to conceal Lucas's involvement in the transactions and for the Company to complete the transactions regardless of whether they were actual businesses with valuable intangible assets.

**B. The Improper Conduct Was Only Disclosed After The Removal Of The Company's Executives And Directors**

127. Just prior to the announcement that the British Columbia Securities Commission would be reviewing the four acquisitions and issuing a cease trade

order suspending trading in the Company's securities on Canadian exchange, the Company announced that Gareth Birdsall, who was the sole founder of the Company, had been "replaced" as President and Secretary on May 6 and as CEO on May 11, 2020.[9]  Likewise, Joe Perino resigned as a director of the Company on May 22, 2020 and Pat McCutcheon, who had only been appointed a director on May 6, 2020, resigned on July 22, 2020.

128.    Moreover, prior to the admission that the Company's accounting for the transactions had been improper, Champignon's CFO, Brohman, resigned from that position and as a director on December 7, 2020.  Thereafter, another director, Bill Wilkerson, resigned as a director on February 1, 2021.[10]

129.    The Company has even admitted that the departure of the CEO, CFO and general counsel were all due to their roles in the events at issue. On the Company's website in the Frequently Asked Questions page, Champignon explained that:

> In connection with the review, the BCSC issued a cease trade order pending the filing of Business Acquisition Reports ("BARs") in connection with three acquisitions: Artisan Growers Ltd., Novo Formulations Ltd., and Tassili Life Sciences Corp (collectively, the "Acquisitions"). ***Normally such reports would be required in connection with any material acquisition. Previous management of the Company, with the support of legal counsel, took the view that they were not required to file such reports under the circumstances. The Commission disagreed*** …
>
> ***
>
> The issues that gave rise to the CTO occurred under the original management of Champignon. ***Since these matters took place, Dr. McIntyre was appointed CEO and has hired a new CFO and General Counsel, both seasoned professionals*** who will help guide the Company's growth.

---

[9] Thereafter, he was also removed as a director on November 23, 2020.

[10] The Company's General Counsel likewise was replaced.

AMENDED CLASS ACTION COMPLAINT
38

130.    The most logical inference from the departure of the Company's CEO and CFO that oversaw the acquisitions, the accounting thereof and the Company's public disclosures, both of whom were certainly directly involved in the Company's conduct, is that they knew (or at the very least deliberately ignored), that the Company's disclosures were misleading.  This is further supported by the mass exodus of directors from the Company's Board.  Moreover, the fact that Champignon only disclosed Lucas Birdsall's involvement and the improper accounting treatments after the CEO and CFO were replaced is further indicative of their knowledge of, or recklessness in not knowing about, the scheme.

### C.    The Company's Transactions Were Core Activities That The Executives Were Aware Of

131.    Prior to the acquisitions, Champignon, was an extremely small company that was essentially a vessel for further acquisitions.[11]    In its IPO, the Company raised less than $3 million.  Yet, the four acquisitions constituted transactions valued at more than $90 million. The Individual Defendants were aware of the details of the Company's business altering transactions, one of which resulted in the Company being subsumed by another company (for accounting purposes); or if the Company's CEO and CFO were unaware, their ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members.  In either case, the only reasonable inference is that the Individual Defendants acted with scienter in concealing Lucas Birdsall's

---

[11] This is confirmed by the accounting treatment of Champignon in the reverse takeover by AtlMed.  Though AltMed is the legal subsidiary of the Company, AltMed is the accounting parent company in connection with the reverse takeover. Therefore, AtlMed was deemed the acquirer for accounting purposes, and as of the acquisition date, the purchase price was allocated among Champignon's assets and liabilities. Of the consideration paid in excess of the fair value of the net assets acquired, $260,000 was allocated to goodwill and the remainder ($77,793,883) was allocated as a "listing expense." That is, the bulk of the Company's value was its status as a publicly traded company.

involvement in the transactions and that the accounting for the intangible assets in the transactions was improper.

### D. Defendants Conducted A Private Placement While Misleading The Market

132. On June 11, 2020, Champignon closed a private placement of common shares and warrants for aggregate gross proceeds of over $15 million. The private placement was conducted pursuant to an offering memorandum which contained the misrepresentations alleged herein. If the related party transactions or the improper accounting of intangible assets for the acquisitions was disclosed, it could have hampered the ability of Champignon to raise this large amount of needed cash to fund its operations.

## VIII. CORPORATE SCIENTER ALLEGATIONS

133. Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Champignon, including each high-ranking officer or director, is imputable to Champignon. The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

134. Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Champignon as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's finances, business practices and growth—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## IX. CLASS ACTION ALLEGATIONS

135. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Champignon securities March 27, 2020 and February 17, 2021, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act. Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

136. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Champignon's shares were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Champignon shares were traded publicly during the Class Period on the OTC. Record owners and other members of the Class may be identified from records maintained by Champignon or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

138. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

139. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Champignon;

(c)     whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(d)     whether the price of Champignon securities was artificially inflated because of Defendants' conduct complained of herein; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein. Moreover, there will be no difficulty in the management of this action as a class action.

## X.     UNDISCLOSED ADVERSE FACTS

141.    The market for Champignon's shares was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Champignon's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Champignon's securities relying upon the integrity of the market price of the Company's securities and market information relating to Champignon, and have been damaged thereby.

142.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Champignon's securities, by publicly issuing

false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Champignon's business, operations, and prospects as alleged herein.

143. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Champignon's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON- THE-MARKET DOCTRINE)

144. The market for Champignon's shares was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Champignon's securities traded at artificially inflated prices during the Class Period. On May 19, 2020, the Company's shares closed at a Class Period high of $1.73 (USD) per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Champignon's shares and market information relating to Champignon, and have been damaged thereby.

145.    During the Class Period, the artificial inflation of Champignon's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Champignon's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Champignon and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

146.    At all relevant times, the market for Champignon's shares was an efficient market for the following reasons, among others:

(a)    Champignon stock met the requirements for listing, and was listed and actively traded on the OTC, a highly efficient and automated market;

(b)    As a regulated issuer, Champignon filed periodic public reports with regulators;

(c)    Champignon regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures; and/or

(d)    The average daily trading volume for Champignon stock during the Class Period was 765,223 shares, and the Company had a market capitalization reaching just over $166.464 million during the Class Period.

147. As a result of the foregoing, the market for Champignon's shares promptly digested current information regarding Champignon from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Champignon's shares during the Class Period suffered similar injury through their purchase of Champignon's securities at artificially inflated prices and a presumption of reliance applies.

148. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

149. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

150. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the purportedly forward-looking statements.

151. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Champignon knowing that the statement was false or misleading when made.

## XIII. CLAIMS

### FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### <u>Against All Defendants</u>

152. Plaintiff repeats and re-alleges each allegation contained above as if fully set forth herein.

153. This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

154. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Champignon's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

155. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of

the Company's shares in an effort to maintain artificially high market prices for Champignon's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

156. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Champignon's financial well-being, business practices and prospects, as specified herein.

157. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Champignon's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Champignon and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

158. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and

was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

159. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Champignon's financial well-being, business practices and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

160. Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Champignon's shares was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, and not disclosed in public during the Class Period, Plaintiff and the other members of the Class acquired Champignon's shares during the Class Period at artificially high prices, and were damaged thereby.

161.  At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Champignon shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

162.  Because of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

163.  As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Champignon securities during the Class Period.

### SECOND CLAIM

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

164.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

165.  This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

166.  The Individual Defendants acted as controlling persons of Champignon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

167. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

168. As set forth above, Champignon and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Champignon's primary Exchange Act Section 10(b) violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) An award to Plaintiff and the Class of their reasonable costs and

expenses incurred in this action, including counsel fees and expert fees;

(d)     Such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 3, 2021                Respectfully submitted,

                                      **GLANCY PRONGAY & MURRAY LLP**


                                      By:  _s/ Casey E. Sadler_
                                      Robert V. Prongay
                                      Casey E. Sadler
                                      1925 Century Park East, Suite 2100
                                      Los Angeles, California 90067
                                      Telephone: (310) 201-9150
                                      Facsimile:  (310) 201-9160
                                      Email:      rprongay@glancylaw.com
                                                  csadler@glancylaw.com

                                      _Counsel for Lead Plaintiff Michael G. Quinn_
                                      _and Lead Counsel for the Class_

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.  On November 3, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 3, 2021 at Los Angeles, California.

*s/ Casey E. Sadler*
Casey E. Sadler