# Exhibit V



SUPREME COURT
OF
BRITISH COLUMBIA

S E A L
*20-Apr-21*

Vancouver

REGISTRY

Court File No. **VLC-S-S-214250**

No. _____

Vancouver Registry

*In the Supreme Court of British Columbia*

Between

JEFFREY LIU

Plaintiff

and

CHAMPIGNON BRANDS INC., WILLIAM GARETH BIRDSALL, LUCAS BIRDSALL, ROGER McINTYRE, STEPHEN BROHMAN, CANACCORD GENUITY CORP., EIGHT CAPITAL and GRAVITAS SECURITIES INC.

Defendants

Brought under the *Class Proceedings Act*, RSBC 1996, c 50

**NOTICE OF CIVIL CLAIM**

**This action has been started by the plaintiff(s) for the relief set out in Part 2 below.**

If you intend to respond to this action, you or your lawyer must

(a)  file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

(b)  serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

(a) file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

(b) serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

Ex. V, at 1

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiff,

    (a) if you were served with the notice of civil claim anywhere in Canada, within 21 days after that service,

    (b) if you were served with the notice of civil claim anywhere in the United States of America, within 35 days after that service,

    (c) if you were served with the notice of civil claim anywhere else, within 49 days after that service, or

    (d) if the time for response to civil claim has been set by order of the court, within that time.

Ex. V, at 2

## CLAIM OF THE PLAINTIFF

**PART 1: STATEMENT OF FACTS**

**Nature of the Action**

1. This proposed securities class action arises out of misrepresentations made in Champignon Brands Inc.'s disclosure documents regarding the true value (or lack thereof) of the Company's four Spring 2020 Acquisitions, as well as the fact that an \ shareholder and undisclosed related party of Champignon who exerted significant influence over the Company was a part owner of all four Acquired Companies and made a sizeable profit from Champignon acquiring them at unreasonably expensive valuations.

2. The Plaintiff advances claims on behalf of himself and other Class Members who acquired securities of Champignon – both in the secondary market or in the Company's June 2020 Private Placement – following the release of documents containing misrepresentations.

3. The Defendants made or are responsible for the misrepresentations.

4. As a result of the Defendants' misconduct, the Plaintiff and the Class Members have suffered loss and damage for which the Defendants are liable.

Ex. V, at 3

**Definitions**

5.    In this Notice of Civil Claim, in addition to terms defined elsewhere herein as well as in the *Securities Act*, RSBC 1996, c 418, the following definitions apply:

a.    "**Acquired Companies**" means collectively Artisan Growers Ltd., Novo Formulations Ltd., Tassili Life Sciences Corp. and AltMed Capital Corp., each individually being an "**Acquired Company**";

b.    "**Acquisitions**" means collectively  **Champignon's** acquisitions of the four **Acquired Companies** completed in March and April of 2020, each individually being an "**Acquisition**";

c.    "**BCSC**" means the British Columbia Securities Commission, which is Champignon's principal securities regulator;

d.    "**Business Acquisition Report**" means a report on Form 51-102F4 that must be completed after a corporation completes a significant acquisition, which describes the acquired business and the effect that the acquisition has on the acquiring company, as required *by National Instrument 51-102*;

e.    "***Business Corporations Act***" means the *Business Corporations Act,* SBC 2002, c 57, as amended;

f.    "**Canaccord**" means Canaccord Genuity Corp.;

g.    "**Champignon**" means Champignon Brands Inc.;

Ex. V, at 4

h.   "**Class**" or "**Class Members**" mean collectively, the **Primary Market Class** and the **Secondary Market Class**;

i.   "**Class Period**" means the period of time from May 12, 2020 to March 11, 2021, inclusive;

j.   "**Company**" means **Champignon**;

k.   "**Corrective Disclosures**" means collectively, the **Partial Correction** and the **Final Correction,** each individually being a **Corrective Disclosure**;

l.   "**Defendants**" means collectively, **Champignon**, the **Underwriters**, and the **Individual Defendants**;

m.   "**Final Correction**" means collectively, **Champignon's**:

   i.   restated financial statement, MD&A, and CEO and CFO certifications for the interim period ended March 31, 2020; and

   ii.   delayed interim financial statements and corresponding MD&A and CEO and CFO certifications for the interim period ended June 30, 2020,

   all of which were publicly issued on March 11, 2021;

n.   "**Gravitas**" means Gravitas Securities Inc.;

o.   "**Impugned Document(s)**" means:

   i.   the Material Change Report pertaining to **Champignon's** acquisition of AltMed Capital Corp, filed on **SEDAR** on May 11, 2020 after market-close;

Ex. V, at 5

    ii.    the investor presentation used as an offering memorandum for **Champignon's** June 2020 **Private Placement**, dated May 2020;

   iii.    **Champignon's** interim financial statements and corresponding **MD&A** and CEO and CFO certifications, filed on **SEDAR** on May 29, 2020;

   iv.    the Share Exchange Agreement regarding **Champignon's** acquisition of Artisan Growers Ltd., filed on **SEDAR** on July 21, 2020;

    v.    the Share Exchange Agreement regarding **Champignon's** acquisition of Novo Formulations Ltd., filed on **SEDAR** on July 21, 2020;

   vi.    the Share Exchange Agreement regarding **Champignon's** acquisition of Tassili Life Sciences Corp, filed on **SEDAR** on July 21, 2020;

   vii.    the **Business Acquisition Report** on Form 51-102F4 pertaining to **Champignon's** acquisition of Artisan Growers Ltd., filed on **SEDAR** on July 21, 2020;

  viii.    the **Business Acquisition Report** on Form 51-102F4 pertaining to **Champignon's** acquisition of Novo Formulations Ltd., filed on **SEDAR** on July 21, 2020; and

   ix.    the **Business Acquisition Report** on Form 51-102F4 pertaining to **Champignon's** acquisition of Tassili Life Sciences Corp., filed on **SEDAR** on July 21, 2020;

p.  "**Individual Defendants**" means collectively, William Gareth Birdsall, Lucas Birdsall, Stephen Brohman and Roger McIntyre;

q.  "**MD&A**" means Management Discussion and Analysis;

r.  "**Other Securities Acts**" means collectively, the *Securities Act*, R.S.A. 2000, c. S-4, as amended; the *Securities Act,* CQLR c V-1.1, as amended; *The Securities Act*, C.C.S.M. c. S50, as amended; the *Securities Act*, S.N.B. 2004, c. S-5.5, as amended; the *Securities Act*, R.S.N.L. 1990, c S-13, as amended; the *Securities Act*, S.N.W.T. 2008, c. 10, as amended; the *Securities Act*, R.S.N.S. 1989, c. 418, as amended; the *Securities Act*, S Nu 2008, c. 12, as amended; the *Securities Act*, R.S.P.E.I. 1988, c S-3.1, as amended; *Securities Act*, R.S.O. 1990, c. S.5, as amended; *The Securities Act, 1988*, S.S. 1988-89, c. S-42.2, as amended; and the *Securities Act*, S.Y. 2007, c. 16, as amended;

s.  "**Partial Correction**" means **Champignon's** news release publicly issued on February 17, 2021 disclosing that the **Company** was restating its interim financials and corresponding **MD&A** for the interim period ended March 31, 2020, as well as that a then-unidentified shareholder and contracted consultant was a related party with respect to the **Acquisitions**;

t.  "**Plaintiff**" means Jeffrey Liu;

u.  "**Primary Market Class**" means all persons and entities other than **Excluded Persons**, wherever they may reside or be domiciled, who acquired securities of **Champignon** pursuant to the **Private Placement** which closed on June 11, 2020;

v.   "**Private Placement**" means **Champignon's** private placement of 17,647,500 units at a price of $0.85 per unit, for aggregate gross proceeds of $15,000,375, which closed on June 11, 2020;

w.   "**Secondary Market Class**" means all persons and entities other than **Excluded Persons**, who during the **Class Period** acquired **Champignon's** securities in the secondary market and who held all or some of those securities until the open of trading on February 17, 2021 and/or until the close of trading on March 11, 2021, and who:

   i.   are residents of Canada or were residents of Canada at the time of such acquisitions, regardless of the location of the exchange on which they acquired **Champignon's** securities; or

   ii.   acquired **Champignon's** securities in the secondary market in Canada or another exchange located outside of the United States, regardless of where they reside or are domiciled;

x.   "*Securities Act*" means *Securities Act*, RSBC 1996, c 418, as amended;

y.   "**SEDAR**" means the System for Electronic Document Analysis and Retrieval; and

z.   "**Underwriters**" means collectively, **Canaccord**, Eight Capital, and **Gravitas**;

Ex. V, at 8

**Overview**

6.      Champignon is a company incorporated in British Columbia under the *Business Corporations Act* that is engaged in the business of formulating and manufacturing ketamine and other psychedelics as well as the delivery platforms for nutraceutical and psychedelic medicines.

7.      Between March 20, 2020 and April 30, 2020, Champignon completed four Acquisitions for total consideration of $92.7 million. The Acquired Companies were represented among other things: to possess "proprietary intellectual property", "complementary R&D advancements", be "absolutely accretive to each other and to [Champignon's] stated business objectives", to have "a variety of proprietary delivery systems" and to "expand[] the Company's aggregation of broad intellectual property".

8.      Champignon did not file a Business Acquisition Report pertaining to the first three Acquired Companies as it was required to pursuant to applicable law. While Champignon did file a Material Change Report with regards to the fourth and final Acquired Company on May 11, 2020 after markets had ended trading for the day (marking the beginning of the Class Period), that Material Change Report was later revealed to contain misrepresentations and suffer from "content deficiency".

9.      The failure to file Business Acquisition Reports and the deficient Material Change Report obscured the fact that all four of the Acquired Companies were partially owned by Defendant Lucas Birdsall, who was both the brother of Champignon's CEO, William Gareth Birdsall, as well as a shareholder of and undisclosed paid consultant to

Champignon who was a related party who exerted significant influence over the Company.

10. On June 11, 2020, Champignon closed the Private Placement of common shares and warrants for aggregate gross proceeds of over $15M with the Underwriters serving as lead underwriters. This Private Placement was conducted pursuant to an offering memorandum which contained misrepresentations. Further, this Private Placement was conducted while the Business Acquisition Reports for the first three Acquisitions were still outstanding, and the Material Change Report pertaining to the fourth Acquisition as well as Champignon's operative interim financial statements and MD&A all contained misrepresentations (and were required to subsequently be amended and restated).

11. On June 22, 2020, Champignon announced that the BCSC had initiated a continuous disclosure review of the Company and specifically "a review of the disclosure surrounding certain recent acquisitions completed by the Company." In connection with the review, the BCSC issued a cease trade order suspending trading in Champignon's securities until the Company filed the outstanding Business Acquisition Reports regarding the first three Acquired Companies. When the Company finally filed the missing Business Acquisition Reports, the BCSC revoked the previous cease trade order and simultaneously issued a replacement cease trade order that was to remain in effect until Champignon filed an amended Material Change Report in connection with its fourth Acquisition that cured content deficiencies in the originally filed Material Change Report. As of the writing of this Claim, the cease trade order against Champignon remains in effect.

12. On February 17, 2021, Champignon issued a press release (the "Partial Correction") announcing that it would be withdrawing and restating its financial statement and MD&A that were released on May 29, 2020 because:

    a. 100% of the intangible assets that were recognized in connection with the Acquisition of the three Acquired Companies that were acquired in the time period covered by the financial statements, did not meet the definition of intangible assets and would be restated as transaction cost;

    b. A (as then unidentified) shareholder and contracted consultant was determined by the Company to be a related party with respect to the Acquisitions, and hence the financial statements and MD&A needed to be restated to include additional details with respect to the related party transactions involving this unnamed shareholder and paid consultant.

13. While the February 17, 2021 Partial Correction did reveal that the financial statements and MD&A would be restated and that the Company's assets would be reduced and costs increased as a result of the restatement, it did not provide specifics as to the impact on other, even more important financial representations that Champignon had made in those Core Documents such as the restatement of net loss (which was later revealed to have been roughly six-times greater for the quarter than originally represented).

14. Further, the Partial Correction did not reveal that the unnamed paid consultant who was both a related party and a shareholder of Champignon and a part owner of all of the Acquired Companies that Champignon acquired in the Acquisitions, was Champignon's CEO's older brother, Lucas Birdsall. The Partial Correction also did not disclose that

Ex. V, at 11

Lucas Birdsall had been compensated nearly $8 million by Champignon just between March 5, 2020 to April 30, 2020.

15.     On March 11, 2021, Champignon filed its restated financial statement, MD&A, and CEO and CFO certifications for the interim period ended March 31, 2020, as well as its delayed interim financial statements and corresponding MD&A and CEO and CFO certifications for the interim period ended June 30, 2020 (collectively the "Final Correction").

16.     The very act of restating its financial statements and corresponding MD&A and amending its Material Change Report pertaining to the final Acquisition, in and of itself, was a tacit admission by Champignon that those Impugned Documents contained material misrepresentations which required restatement.

17.     The Final Correction provided further details that was missing from the Partial Correction and fully revealed and corrected the misrepresentations made in the Impugned Documents. Among other things, the Final Correction revealed for the first time that:

   a.   the Company's total assets were 84% less than what was represented in the financial statements, the Company's total liability was 34% greater than what was represented in financial statements, the Company's shareholder equity was 84% less than what was represented in the financial statements, the Company's net loss for the period was <u>nearly six-times greater</u> than what represented in the financial statements, and the net loss per share was in fact <u>575% greater</u> than the Company had represented in the financial statements;

b.  the brother of the CEO at the time of all four Acquisitions, Lucas Birdsall, was the undisclosed consultant to Champignon and a shareholder who exerted significant influence over Champignon, and was also an undisclosed part owner of all four Acquired Companies; and

c.  Lucas Birdsall was compensated over $7.91 million from Champignon for the Acquisitions, for consulting fees and with stock options just in March and April of 2020 (the Company's entire market capitalization was only about $45.6 million as of April 1, 2020).

18.  It was further revealed after the close of the Class Period that the abrupt replacements of William Birdsall, Stephen Brohman, and the Company's General Counsel all pertained to their respective roles in the aforementioned events and in causing the cease trade order, despite this fact not being disclosed at the time (and the Company even going so far as to thank William Gareth Birdsall for his services to Champignon when announcing his replacement).

19.  As a result of the cease trade order imposed against the Company remaining ongoing as of the date of this pleading, the correction of Champignon's prior misrepresentations has not yet been able to impact its stock price on the Canadian Securities Exchange ("CSE"). However, the Company's securities in the over-the-counter market ("OTC") in the United States continued to trade throughout the Class Period and provides some insight into the significant loss of value caused to the Company as a result of the revelation of the misrepresentations and disclosure of the relevant material change.

Ex. V, at 13

20.     On February 17, 2021 upon the release of the Partial Correction, Champignon's share price on the OTC dropped 11% (from USD $0.77/share to USD $0.687/share) in a single day on abnormally-high trading volume. The ten-day volume-weighted average price of the stock following the Final Correction on March 11, 2021 was 44% lower than the closing price on February 16, 2021.

21.     As a result of the Defendants' misrepresentations and failure to make timely disclosure of a material change, the Plaintiff and Class Members have incurred significant loss and damages on their investment in Champignon's securities. The Plaintiff has brought this action on his own behalf and on behalf of the Class to recover compensation for the loss and damage that they have suffered.

**The Parties**

The Plaintiff and the Proposed Class

22.     Jeffrey Liu is an individual who resides in Burnaby, British Columbia.

23.     In reliance on the information contained in some or all of the Impugned Documents as well as his belief that Champignon was making timely disclosure of all material changes in its business and affairs, on June 8, 2020, Mr. Liu purchased 18,120 Champignon common shares listed on the CSE at an average price of $1.16 per share for a total cost of $21,029.15 (including commission fees). On June 10, 2020, Mr. Liu purchased an additional 4,960 Champignon common shares listed on the CSE at an average price of $1.09 per share for a total cost of $5,416.35 (including commission fees).

24.    Mr. Liu continued to hold these shares until after Champignon was cease traded by the BCSC on June 22, 2020, and after the Corrective Disclosures were released on February 17, 2021 and March 11, 2021.

25.    Mr. Liu brings this action on behalf of the Class Members, all of whom acquired Champignon's securities during the Class Period (either in the Private Placement or in the secondary market) and held some or all of those securities as of the open of trading on February 17, 2021 and/or the close of trading on March 11, 2021.

The Defendants

*Champignon*

26.    Champignon is a company that was incorporated under the *Business Corporations Act* on March 26, 2019. At the start of the Class Period, the Company's registered address was Suite 704-595 Howe Street in Vancouver, BC, and its principal address was Suite 2300-1177 West Hastings Street in Vancouver, BC. However, the Company has since moved its principal and registered address to Mississauga, Ontario.

27.    At all times relevant to this action, Champignon was a reporting issuer in British Columbia and a responsible issuer within the meaning of the *Securities Act*.

28.    At all times relevant to this action, Champignon's securities were publicly listed for trading on the CSE under the ticker symbol "SHRM". They also traded on the OTC in the United States under the ticker symbol SHRMF, as well as the Frankfurt Stock Exchange under the ticker symbol "496".

*William Gareth Birdsall*

29.    William Gareth Birdsall founded Champignon in 2019 when he was 24 years old. At the time of all four Acquisitions, William Gareth Birdsall was the Company's Chief Executive Officer ("CEO"), President and Secretary, as well as a director on Champignon's board.

30.    William Gareth Birdsall was replaced as President and Secretary on or about May 6, 2020 and replaced as CEO on or about May 11, 2020. He ceased being a director as of November 23, 2020 as part of the Company's purported "comprehensive change at the top" to management and governance.

31.    As of March 26, 2021, William Birdsall held 3.55 million Champignon common shares and 3,000,000 share purchase warrants exercisable at a price of $0.10.

*Lucas Birdsall*

32.    Lucas Birdsall is the older brother of the Company's former CEO, William Gareth Birdsall, and was a shareholder of the Company as well as a contracted consultant and undisclosed related party with significant influence over Champignon. He was also a part owner of all four of the Acquired Companies that were purchased by Champignon in the Acquisitions.

33.    On November 17, 2020, Champignon terminated its consulting agreement with Lucas Birdsall.

34.     It was not until March 11, 2021 that Champignon revealed that Lucas Birdsall was the shareholder and former contracted consultant to Champignon, and disclosed for the first time that he was a related party who "exerted significant influence over the Company".

35.     Champignon further revealed that between March 5, 2020 to April 30, 2020, Lucas Birdsall had been compensated over $7.91 million in cash and Champignon shares for consulting fees, stock options, and as compensation for Champignon's Acquisition of the four Acquired Companies of which he was a part-owner.

*Roger McIntyre*

36.     Roger McIntyre replaced William Gareth Birdsall as CEO on May 11, 2020, and was CEO at all times during the Class Period and currently. He was appointed a director on Champignon's board on July 22, 2020.

37.     McIntyre was also the founder and a significant shareholder of AltMed Capital Corp (along with Lucas Birdsall), which was one of the Acquired Companies that Champignon acquired as part of the Acquisitions.

38.     In his capacity as CEO and director, McIntyre made or was responsible for misrepresentations made during the Class Period, including signing the CEO certification on Form 52-109FV2 released on May 29, 2020, which represented that the corresponding interim financial statements and MD&A did not contain any untrue statements or omissions of material fact and fairly presented in all material respects the financial condition, financial performance and cash flows of Champignon.

*Stephen Brohman*

39.     Stephen Brohman was Champignon's Chief Financial Officer ("CFO") and a director on the Company's board of directors at all relevant times until he resigned from both of those positions on December 7, 2020.

40.     In his capacity as CFO and director, Brohman made or was responsible for misrepresentations made during the Class Period, including signing the CFO certification on Form 52-109FV2 released on May 29, 2020, which represented that the corresponding interim financial statements and MD&A did not contain any untrue statements or omissions of material fact and fairly presented in all material respects the financial condition, financial performance and cash flows of Champignon.

*Underwriters*

41.     Canaccord is an investment banking and financial services company, which maintains its headquarters in Vancouver, British Columbia. Canaccord acted as co-lead underwriter for the Private Placement, for which it was compensated $525,013 in cash and with 617,662 broker warrants.

42.     Eight Capital is a financial institution that offers investment banking and institutional sales and trading services, which maintains its headquarters in Toronto, Ontario. Eight capital acted as co-lead underwriter for the Private Placement, for which it was compensated $420,010.40 in cash and with 494,130 broker warrants.

43.     Gravitas is a financial institution and investment bank with offices in Vancouver and Toronto. Gravitas was an underwriter for the Private Placement, for which it was compensated $105,002.60 in cash and with 123,533 broker warrants.

Ex. V, at 18

44.    The Underwriters conducted the Private Placement, which closed on June 11, 2020, pursuant to investor presentation dated May 2020 which was used as an offering memorandum to market the Private Placement.

**Champignon's Disclosure Obligations**

45.    At all times relevant to this action, Champignon was, by its own election, a reporting issuer in British Columbia and a responsible issuer within the meaning of the *Securities Act*. Champignon elected to become a reporting issuer in order to render its securities publicly tradeable. Doing so made its securities a more attractive investment and provided Champignon with broader access to capital, which is required to sustain its operations because it is a development stage company that generates very little revenue and has never made a profit in its history.

46.    In order to maintain its status as a reporting issuer, Champignon was required to issue and file on SEDAR, *inter alia*:

   a.    Within 45 days of the end of each quarterly interim period, accurate quarterly financial statements prepared in accordance with applicable accounting principles; and

   b.    Contemporaneously, a MD&A corresponding to each interim financial statement providing a narrative explanation of how the company performed during the period covered by the financial statements, and of the company's financial condition and future prosects. The MD&A must discuss known trends, events, and risks that have affected the financial statements of the issuer, or that are reasonably likely to have an effect on the issuer's business in the future.

Ex. V, at 19

47.     Further, as a reporting issuer Champignon is required to file:

   a.   A Material Change Report on Form 51-102F3 and corresponding press release if a material change occurs in the affairs of the reporting issuer, as soon as practicable and in any event within 10 days of the date on which the material change occurred; and

   b.   a Business Acquisition Report on Form 51-102F4, generally within 75 days after completing a significant acquisition completes, which describes the acquired business and the effect that the acquisition has on the Company. The requirement for a reporting issuer to file a Business Acquisition Report is in addition to its obligation to file a Material Change Report if the significant acquisition constitutes a material change.

**The Individual Defendants' Disclosure Obligations**

48.     Each of William Gareth Birdsall, Roger McIntyre and Stephen Brohman (collectively the "Director Defendants") knew, from the time that they accepted their positions with Champignon, that Champignon was a reporting issuer and that they would have direct responsibility for ensuring the accuracy of the Company's disclosure documents.

49.     The *Securities Act*, the Other Securities Acts and certain instruments and policies promulgated thereunder imposed specific obligations on the Director Defendants in the preparation of Champignon's disclosure documents.

50.     *National Instrument 51-102 Continuous Disclosure Obligations* requires the board of directors of a reporting issuer to approve each set of financial statements and

accompanying MD&A released by the issuer prior to the release of those documents. As such, the Director Defendants, each of whom was a director of Champignon during the Class Period, reviewed and approved the financial statements and related MD&A prior to their release on May 29, 2020.

51.    *National Instrument 52-109 Certification of Disclosure in Issuers' Annual and Interim Filings* requires the CEO and CFO of a reporting issuer to certify that the corresponding interim financial statements and MD&A do not contain any untrue statements or omissions of material fact and fairly present in all material respects the financial condition, financial performance and cash flows of the issuer. Pursuant to this *National Instrument*, Defendants McIntyre and Brohman signed the CEO and CFO Certifications with respect to Champignon's financial statements and corresponding MD&A that was released on May 29, 2020.

52.    Lucas Birdsall was an "influential person" within the meaning of Part 16.1 of the *Securities Act* (and the concordant provisions of the Other Securities Acts), as he was both an insider of Champignon and a control person in respect of the Company.

53.    The *Securities Act*, the Other Securities Acts and certain instruments and policies promulgated thereunder impose specific obligations on influential persons regarding the preparation of disclosure documents for the responsible issuer, requiring that they *inter alia* be free from misrepresentations and make timely disclosure of all material changes.

**The Underwriters' Duty of Care**

54.    As the Private Placement was a "bought deal", the Underwriters sold each security (common shares and warrants) offered under the Private Placement directly to the

members of the Primary Market Class. They had an obligation to ensure the securities that they were selling were not being sold pursuant to misrepresentations and omissions about the Company and its business and affairs.

55.     In connection thereto, the Underwriters were required to conduct due diligence and a reasonable investigation to ensure that the information contained in the investor presentation dated May 2020, as well as the other information which existed in the public domain about Champignon, was free of misrepresentations and omissions.

**The Material Facts Underpinning This Action**

The Acquired Companies

*Artisan Growers Ltd.*

56.     Artisan Growers Ltd. ("AGL") was a company that was incorporated on September 5, 2019, just over six months prior to its acquisition by Champignon.

57.     From its date of incorporation until February 29, 2020, AGL had made $0 in revenue against a net loss of $23,039 (made up predominantly of depreciation). As at February 29, 2020, AGL had negative net assets of -$23,029, consisting of total assets of $13,981 against total liabilities of $37,010.

58.     The audit report that Champignon obtained in respect of AGL dated July 3, 2020 (more than 3 months after Champignon had already acquired AGL) indicated that due to AGL being expected to continue to incur further losses without making a profit, "a material uncertainty exists that may cast significant doubt on [AGL's] ability to continue as a going concern."

59.     On or about March 20, 2020, Champignon acquired AGL for total consideration of 8.8 million common shares worth over $2.55 million.

60.     Lucas Birdsall held a 16.0% ownership interest in AGL and was issued 1.28 million Champignon shares worth $371,200 in connection with Champignon's acquisition of AFL.

61.     On July 6, 2020 (i.e., nearly four-months after the acquisition and only because the BCSC took exception), Champignon obtained a valuation report in respect of AGL, which unhelpfully "concluded that the most appropriate means of determining the fair market value of AGL, at the time of its acquisition by the Company, was to rely upon the consideration offered by the Company."

*Novo Formulations Ltd.*

62.     Novo Formulations Ltd. ("NFL") was incorporated on September 25, 2019, exactly six months before it was acquired by Champignon.

63.     From its date of incorporation until February 29, 2020, NFL had made $0 in revenue and had a net loss of $5,260 consisting entirely of "research costs". As at February 29, 2020, NFL had net assets of $10, comprised of total assets of $10 in cash against $0 in total liabilities.

64.     The audit report that Champignon obtained in respect of NFL dated July 8, 2020 (again months after Champignon had already acquired NFL) indicated that due to NFL being expected to continue to incur further losses without making a profit, "a material

Ex. V, at 23

uncertainty exists that may cast significant doubt on [NFL's] ability to continue as a going concern."

65.   On or about March 25, 2020, Champignon acquired NFL for total consideration of 13.5 million common shares worth $4.725 million. Put another way, Champignon gave $4.725 million worth of shares to purchase a six-month old company that had never made a cent in revenue and whose total assets and liabilities consisted of $10 in cash.

66.   Lucas Birdsall held a 12.0% ownership interest in NFL and was issued 1.5 million Champignon shares worth $435,000 in connection with Champignon's acquisition of NFL.

67.   On July 6, 2020 due to the BCSC review, Champignon obtained a valuation report in respect of NFL from the same company that it used to valuate AGL, which again unhelpfully "concluded that the most appropriate means of determining the fair market value of NFL, at the time of its acquisition by the Company, was to rely upon the consideration offered by the Company."

*Tassili Life Sciences Corp.*

68.   Tassili Life Sciences Corp. ("TLS") was incorporated on March 20, 2018.

69.   From its date of incorporation on March 20, 2018 until December 31, 2019, TLS had made $0 in revenue against a net loss of $26,027 (made up predominantly of consulting fees and professional fees). As at December 31, 2019, TLS had negative net assets of -$5,024, consisting of total assets of $3,395 (almost all cash) against total liabilities of $8,419.

70.    The audit report that Champignon obtained in respect of TLS dated June 23, 2020 (once again months after Champignon had already acquired TLS) indicated that due to TLS being expected to continue to incur further losses without making a profit, "a material uncertainty exists that may cast significant doubt on [TLS'] ability to continue as a going concern."

71.    On or about March 26, 2020, Champignon acquired TLS for total consideration of 17.5 million common shares worth approximately $6.39 million.

72.    Lucas Birdsall held at least a 15.625% ownership interest in TLS and was issued 3 million Champignon shares worth $1,470,000 in connection with Champignon's acquisition of TLS.

73.    On July 6, 2020 due to the BCSC review, Champignon obtained a valuation report in respect of TLS again from the same company that it also used to valuate AGL and TLS. This time however, even the valuator could not conclude that the most appropriate means to determine the fair market value of TLS was to rely upon the consideration paid by Champignon. Rather, Champignon's own valuator "concluded that the fair market value of TLS, at the time of its acquisition by the Company, was $4,900,000" (i.e., more than 23% less than the $6.39 million that was paid by Champignon).

*AltMed Capital Corp.*

74.    AltMed Capital Corp. ("AltMed") was a private company that was incorporated on September 9, 2019. It was founded by Champignon's current CEO, Defendant McIntyre, who was also a significant shareholder of AltMed.

75.    From its date of incorporation until March 31, 2020, AltMed had made $0 in revenue against a net loss of $1.93 million (made up almost entirely of "stock based compensation" expense). As at March 31, 2020, AltMed had net assets of $2.98 million, consisting of total assets of $3.06 million (almost all cash) against total liabilities of $79,042.

76.    The audit report that Champignon obtained in respect of AltMed dated August 7, 2020 (once again months after Champignon had already acquired AltMed) indicated that there were "matters and conditions that indicate the existence of a material uncertainty that may cast significant doubt on [AltMed's] ability to continue as a going concern."

77.    On April 30, 2020, Champignon acquired AltMed in a reverse takeover transaction for total consideration of over $79 million.

78.    Lucas Birdsall held a 7.953% ownership interest in AltMed and was issued 6.02 million Champignon shares worth $5.36 million in connection with Champignon's acquisition of AltMed.

Relevant Disclosure Prior to the Class Period

79.    On May 6, 2020, Champignon issued a news release announcing changes being made to its management and board of directors. In this news release, Champignon announced that William Gareth Birdsall was being replaced as President and Secretary of the Company, but expressly added that "Gareth Birdsall will remain CEO and a director of Champignon".

80.     On May 11, 2020, despite the Company's absolutely unequivocal statement just a few days prior that William Gareth Birdsall would remain the Company's CEO, Champignon issued a news release announcing that William Gareth Birdsall was being replaced as CEO by Roger McIntyre. The Company did not provide the reason for the abrupt reversal of its stated position regarding William Gareth Birdsall. Instead, despite revealing after the end of the Class Period that William Gareth Birdsall, Stephen Brohman, and the Company's former General Counsel were all replaced due to their involvement in the events that led to the Company being cease-traded by the BCSC, in this news release the Company went so far as to "thank Mr. Birdsall for his services throughout his tenure as CEO".

The Impugned Documents

81.     On **May 11, 2020** after markets had closed for the day, Champignon filed on SEDAR a Material Change Report pertaining to its acquisition of AltMed which closed on April 30, 2020.

82.     This Core Document contained a misrepresentation by omission by, *inter alia*, omitting to disclose that Lucas Birdsall, who was an unnamed consultant and undisclosed related party who exerted significant influence over Champignon, was also a significant shareholder of AltMed and was being compensated $5.36 million worth of shares from Champignon's purchase of AltMed.

83.     This Core Document further contained misrepresentations by not disclosing any of the accurate financial details about AltMed, nor the proper accounting treatment and potential ramifications of the Acquisition. Specifically:

Ex. V, at 27

a. the Material Change Report stated that Champignon was acquiring AltMed without disclosing that the transaction should properly be treated as a reverse take-over and would require the filing of a new listing statement and could cause the Company to be cease-traded;

b. the Company did not provide any relevant corporate or financial details about AltMed, and specifically that AltMed had only been incorporated six months prior and through March 31, 2020 had no revenues, its assets were almost entirely comprised of cash, and there was a material uncertainty about AltMed's ability to even continue as a going concern.

84. The Company subsequently admitted after the Class Period that it was cease-traded by the BCSC because this Material Change Report suffered from "content deficiency".

85. In **May of 2020**, Champignon and the Underwriters issued an investor presentation to market the Company's securities for the Private Placement that was to be conducted the following month.

86. This disclosure document contained misrepresentations *inter alia* because it omitted to disclose: (1) that Lucas Birdsall was both a paid consultant and related party who exerted significant influence over Champignon; (2) that the Company's four Acquisitions completed only weeks prior were all of companies that were owned by this undisclosed related party; and (3) this undisclosed related party was compensated from Champignon for consulting fees, stock options, and for his interest in the Acquired Companies nearly $8 million just in March and April of 2020 (amounting to more than 17% of the Company's Market capitalization as at April 1, 2020).

87.    On **May 29, 2020**, Champignon issued its:

    a.    interim financial statements for the three and six-month interim period ended March 31, 2020;

    b.    the corresponding MD&A; and

    c.    the CEO and CFO certifications relating to the aforementioned financial statements and MD&A.

88.    These Core Documents contained misrepresentations because *inter alia*:

    a.    they represented the intangible assets acquired as part of the AGL, NFL, and TLS Acquisitions to be worth $11.75 million when they were in fact worth $0;

    b.    they represented that the total assets of Champignon as at March 31, 2020 equalled $14.1 million when they in fact equaled $2.3 million – a reduction of 83.6%;

    c.    they represented that the Company's shareholder equity as at March 31, 2020 equal $14.0 million when it in fact equalled $2.2 million – a reduction of 84.2%;

    d.    they represented that Champignon's net loss for the three-month period ended March 31, 2020 equalled $2.8 million, when the true figure was almost six-times higher at $16.3 million;

    e.    they represented that the less per share for the three-month period ended March 31, 2020 equalled $0.08/share when it in fact equalled $0.54/share – an increase of 575%;

Ex. V, at 29

f.  they underrepresented the company's total liabilities as at March 31, 2020 by 33.9%;

g.  they omitted the material fact that the brother of the CEO at the time all of the Acquisitions were completed, Lucas Birdsall, was an undisclosed consultant and shareholder to Champignon and a related party who exerted significant influence over the Company, as well as a significant part-owner of all four Acquired Companies. In fact under the section "Related Party Transactions", the MD&A outlined consulting fees paid to companies controlled by the CEO and CFO but excluded Lucas Birdsall;

h.  they omitted the material fact that related party Lucas Birdsall had been compensated more than $2.5 million (equating to more than 5% of Champignon's entire market capitalization as at April 1, 2020) just in March of 2020 from Champignon for his stake in the Acquired Companies, for consulting fees, and with stock options;

i.  the MD&A represented that the Company maintained "disclosure controls and procedures and internal controls over financial reporting to meet" the standard required of a reporting issuer; and

j.  the CEO and CFO certifications represented that the corresponding interim financial statements and MD&A did not contain any untrue statements or omissions of material fact and fairly presented in all material respects the financial condition, financial performance and cash flows of Champignon for the time period that they covered.

89.    The financial statements were signed as "Approved on behalf of the Board" by Defendant William Gareth Birdsall as well as another director. Defendants McIntyre and Brohman signed the CEO and CFO certifications respectively.

90.    On **June 11, 2020**, Champignon closed the Private Placement of 17,647,500 units for aggregate gross proceeds of $15 million. The Private placement was conducted pursuant to the investor presentation dated May 2020. This Private Placement was conducted pursuant to the outstanding misrepresentations that existed in the public domain about the Company, including*:*

   a.    the omission to disclose that Lucas Birdsall was a related party and that he was a part-owner of all four Acquired Companies and was compensated nearly $8 million from Champignon in March and April of 2020;

   b.    representing that the Company's financials were as disclosed in the May 29, 2020 financial statements and omitting to disclose that in fact, Champignon had *inter alia* significantly less assets and more liabilities and had incurred a nearly six-times greater net loss than what was being represented.

91.    On **July 21, 2020**, Champignon filed on SEDAR:

   a.    3 Share Exchange Agreements pertaining to the Company's Acquisitions of AGL, NFL and TLS, respectively; and

   b.    3 (late) Business Acquisition Reports on Form 51-102F4 pertaining to the Company's Acquisitions of AGL, NFL and TLS, respectively.

92. These documents all contained misrepresentations because among other things, they omitted to identify Lucas Birdsall as a beneficial shareholder of all three Acquired Companies and a related party of Champignon who was being compensated millions from the Acquisitions by Champignon. In fact, the Business Acquisition Reports stated that the three Acquisitions were "not with an informed person, associate or affiliate of the Company."

The Corrective Disclosures

*The Partial Correction*

93. On **February 17, 2021**, Champignon issued a news release announcing that as a result of the review by the BCSC, the Company was withdrawing its financial statements and MD&A for the interim period ended March 31, 2020 (released on May 29, 2020), and would be restating those Core Documents.

94. The Company revealed in this Partial Correction that:

    a. for the period in question, it had recognized intangible assets in connection with the Acquisitions of AGL, NFL and TLS of approximately $12 million, which management had determined was required to be restated to $0 because the assets do not meet the definition of intangible assets;

    b. it was determined that a shareholder and contracted consultant of the Company (only identified at that time as "the Consultant") was a related party with respect to the Acquisitions, and the restated financials and MD&A would include additional disclosure with respect to related party transactions involving the Consultant; and

c.   the original financial statements and MD&A released May 29, 2020 should not be relied upon.

95.   The Partial Correction did not however reveal the extent of the impact on the Company's financials, such as the fact that net loss for the period was six times greater than originally represented and liabilities were materially understated. Further, the Partial Correction did not disclose that Lucas Birdsall was the unnamed Consultant, nor disclose the unreasonable extent to which he had been compensated (i.e. more than $7.91 million in just March and April of 2020 from a company that was valued only around $45.6 million as of April 1, 2020).

96.   While the impact of the Partial Correction could not be felt on the Company's stock price on the CSE (due to the ongoing cease trade), on the OTC Champignon's stock dropped by 11% just on February 17, 2021 on abnormally high trading volume. Over the next ten trading days, the volume-weighted average price of the stock was 21% lower than the closing price on February 16, 2020 (the day before the Partial Correction).

*The Final Correction*

97.   On **March 11, 2021**, Champignon issued *inter alia* its restated financial statement, MD&A, and CEO and CFO certifications for the interim period ended March 31, 2020, as well as its delayed interim financial statements and corresponding MD&A and CEO and CFO certifications for the interim period ended June 30, 2020.

98.   In this Final Correction, the Company fully revealed the extent of its aforementioned misrepresentations and failure to make timely disclosure, including finally revealing:

a.  Lucas Birdsall was the unnamed consultant and related party who exerted significant influence over Champignon;

b.  Lucas Birdsall was a part owner of all four Acquired Companies, and had been compensated over $7.91 million by Champignon just between March 5-April 30, 2020 in consulting fees, for the Acquisitions, and with stock options;

c.  the Company's total assets were 84% less than what was represented in the financial statements, the Company's total liability was 34% greater than what was represented in the financial statements, and the Company's net loss for the period was nearly six-times greater than what represented in the financial statements (among other misrepresentations contained in the financial statements and MD&A); and

d.  The Company's representation in the original MD&A that it maintained "disclosure controls and procedures and internal controls over financial reporting to meet" the standard required of a reporting issuer was shown to be false.

99.  Champignon's stock price on the OTC continued to drop after this Final Correction, with the Company's ten-day volume-weighted average price following the Final Correction dropping 44% relative to its closing price on February 16, 2021 (the day before the Partial Correction when the Company revealed that it had to restate its financial statements and MD&A).

100.  Also in March of 2021, Champignon posted a Frequently Asked Questions page on its website. Under the question, "Why was the CTO [cease trade order] imposed?",

Ex. V, at 34

Champignon admitted in part that the cease trade was imposed because of the actions of William Gareth Birdsall, Stephen Brohman and the Company's former legal counsel:

> In connection with the review, the BCSC issued a cease trade order pending the filing of Business Acquisition Reports ("BARs") in connection with three acquisitions: Artisan Growers Ltd., Novo Formulations Ltd., and Tassili Life Sciences Corp (collectively, the "Acquisitions"). <u>Normally such reports would be required in connection with any material acquisition. Previous management of the Company, with the support of legal counsel, took the view that they were not required to file such reports under the circumstances</u>. The Commission disagreed … [emphasis added]

101.    The Company made these revelations about William Gareth Birdsall, Brohman and the Company's former legal counsel even more explicit under the heading "Why should investors rely on the Company?"

> <u>The issues that gave rise to the CTO occurred under the original management of Champignon. Since these matters took place, Dr. McIntyre was appointed CEO and has hired a new CFO and General Counsel</u>, both seasoned professionals who will help guide the Company's growth. [emphasis added]

**The Relationship Between the Impugned Documents and the Price of Champignon's Securities**

102.    The price and/or value of Champignon's securities was directly affected during the Class Period by the issuance of the Impugned Documents. The Defendants were aware at all material times of the effect of the Impugned Documents upon the price of Champignon's securities.

103.    The Impugned Documents were disseminated, among other places, on SEDAR, and thereby became immediately available to, and were reproduced for inspection by, the

Ex. V, at 35

Class Members and other members of the investing public, financial analysts and the financial press.

104.    Champignon routinely transmitted its disclosure documents to the financial press, financial analysts and certain prospective and actual holders of Champignon's securities. Champignon also posted a copy of certain of the Impugned Documents on its website, as well as providing a link to its SEDAR page on its website.

105.    Champignon regularly communicated with public investors and financial analysts via established market communication mechanisms, including through regular disseminations of its disclosure documents, including news releases on newswire in Canada and elsewhere. Champignon also paid tens of thousands of dollars to various publications for media articles about the Company. Each time Champignon communicated new material information about the Company to the public, the price and/or value of Champignon's securities was directly affected.

106.    Champignon was the subject of various articles and reviews, with the effect that any recommendations to purchase the Company's securities in such articles during the Class Period were based, in whole or in part, upon the information disseminated (or omitted) by Champignon.

107.    Champignon's securities were and are traded (when not cease traded), among other places on the Canadian Securities Exchange, which is an efficient and automated market. The prices at which Champignon's securities traded promptly incorporated material information about Champignon's disclosure documents concerning the Company's business and affairs, including the misrepresentations and omissions alleged herein,

Ex. V, at 36

which was disseminated to the public through the Impugned Documents and distributed by Champignon, as well as by other means.

108. If the Impugned Documents had not contained the misrepresentations particularized herein and Champignon had made timely disclosure of all material changes as required:

a. the trading price of Champignon's securities would have promptly incorporated that material information and declined;

b. the Class Members would have acquired Champignon's securities during the Class Period at a lower price than they did, or would not have acquired Champignon's securities at all; and

c. Class Members would not have sustained the damages that they did sustain.

## PART 2: RELIEF SOUGHT

1. On behalf of himself and the other Class Members, the Plaintiff seeks:

a. an order granting leave to proceed pursuant to section 140.8 of the *Securities Act* and the analogous provisions in the Other Securities Acts (if necessary);

b. an order certifying this action as a class proceeding and appointing the Plaintiff as the representative plaintiff for the Class;

c. a declaration that the Impugned Documents contained one or more misrepresentations at common law and within the meaning of the *Securities Act* and the Other Securities Acts (if necessary);

d.   a declaration that one or more of the Defendants made the alleged

misrepresentations;

e.   a declaration that the Impugned Documents failed to make timely disclosure of a

material change within the meaning of the *Securities Act* and the Other Securities

Acts (if necessary);

f.   a declaration that Champignon is vicariously liable for the acts and/or omissions

of the Individual Defendants and, as may be applicable, of its other officers,

directors, employees or agents;

g.   A declaration that Cannacord, Eight Capital and Gravitas are vicariously liable for

the acts and/or omissions of their respective officers, directors, partners,

employees or agents;

h.   on behalf of the members of the Secondary Market Class

i.   statutory damages assessed in accordance with section 140.5 of the

*Securities Act* (and the analogous provisions of the Other Securities Acts,

if necessary), pursuant to section 140.3 of the *Securities Act* (and the

analogous provisions of the Other Securities Acts, if necessary) against

Champignon and the Individual Defendants; and

ii.   general and special damages for negligent misrepresentation against just

Champignon;

Ex. V, at 38

i.   on behalf of the members of the Primary Market Class, statutory damages pursuant to section 132.1 of the *Securities Act* (and the analogous provisions of the Other Securities Acts, if necessary), and general and special damages for negligent misrepresentation, against Champignon and the Underwriters;

j.   an order directing a reference or giving such other directions as may be necessary to determine the issues, if any, not determined at the trial of the common issues;

k.   interest under the *Court Order Interest Act*, RSBC 1996, c 79, as amended;

l.   costs for the administration of any court award or judgment obtained in this action; and

m.   such further and other relief as this Honourable Court may deem just.

## PART 3: LEGAL BASIS

1.   The Plaintiff pleads and relies on the:

a.   *Securities Act*, and if necessary, the Other Canadian Securities Legislation;

b.   *Court Jurisdiction and Proceedings Transfer Act,* SBC 2003, c 28, as amended; and

c.   *Court Order Interest Act,* RSBC 1996, c 79, as amended.

**Statutory Secondary Market Liability**

2.   On behalf of the Secondary Market Class, the Plaintiff pleads the rights of action found in section 140.3(1) and (4) of the *Securities Act* (and, if necessary, the equivalent sections of

the Other Securities Legislation) against Champignon and the Individual Defendants for the misrepresentations contained and/or omitted in the Impugned Documents and failure to make timely disclosure of a material change, subject to leave being granted under section 140.8 of the *Securities Act* (and, if necessary, the equivalent sections of the Other Securities Legislation).

3. At all material times, Champignon was a "responsible issuer" within the meaning of Part 16.1 of the *Securities Act* (and, if necessary, the equivalent provisions of the Other Securities Act).

4. William Gareth Birdsall, Roger McIntyre and Stephen Brohman (i.e., the "Director Defendants") were officers and/or directors of Champignon at the time each Impugned Document was released. As officers and/or directors of Champignon, the Directors Defendants authorized, permitted or acquiesced in the release of the Impugned Documents.

5. Lucas Birdsall was an "influential person" within the meaning of Part 16.1 of the *Securities Act* (and if necessary, the equivalent provisions of the Canadian Securities Acts) because he was an insider of Champignon and a control person in respect of the Company (as he exerted significant influence over the Company). Lucas Birdsall knowingly influenced Champignon or any person acting on behalf of Champignon to release the Impugned Documents and/or fail to make timely disclosure, and/or Lucas Birdsall knowingly influenced one or more directors or officers of Champignon to authorize, permit, or acquiesce in the release of the Impugned Documents and/or failure to make timely disclosure.

6.     Each of the Impugned Documents is a "document" within the meaning of Part 16.1 of the *Securities Act* (and if necessary, the equivalent provisions of the Canadian Securities Acts).

7.     The Plaintiff and the other members of the Secondary Market Class who purchased securities of Champignon in the secondary market during the Class Period are entitled to damages assessed in accordance with section 140.5 of the *Securities Act* (and, if necessary, the equivalent provisions of the Other Securities Acts).

**Common Law Secondary Market Liability (Negligent Misrepresentation)**

8.     On behalf of the Secondary Market Class, the Plaintiff pleads negligent misrepresentation against Champignon for misrepresentations in the Impugned Documents.

9.     The Impugned Documents were prepared and disseminated for the purpose of providing material information and inducing members of the Secondary Market Class to purchase Champignon's securities.

10.    Champignon undertook, at all material times, to prepare and disseminate the Impugned Documents with reasonable care for the aforementioned purpose. Champignon intended and was aware that members of the Secondary Market Class would rely reasonably and to their detriment upon the Impugned Documents in making the decision to purchase Champignon's securities.

11.    Champignon further knew and intended that the information contained in the Impugned Documents would be incorporated into the price of Champignon's publicly traded

securities such that the trading price of those securities would at all times reflect the information contained in the Impugned Documents.

12.    Champignon had responsibility for the preparation of the Impugned Documents and undertook to do so for the benefit of, and to be relied upon by, members of the Secondary Market Class.

13.    Champignon therefore had a duty of care at common law to exercise due care and diligence to ensure that the Impugned Documents fairly and accurately disclosed all material information about the Company.

14.    Champignon breached that duty by failing to take reasonable (or any) steps to ensure that the Impugned Documents did not contain the misrepresentations and omissions particularized herein.

15.    Throughout the Class Period, Champignon had exclusive access to the true information about Champignon's business and operations, including the Acquisitions and the fact that Lucas Birdsall was a related party. As such, Champignon was the primary source of information with respect to Champignon's business and operations.

16.    The members of the Secondary Market Class directly or indirectly relied upon the misrepresentations and omissions in the Impugned Documents in making a decision to purchase Champignon's securities, and suffered damage when the misrepresentations were publicly corrected.

17.    Alternatively, the members of the Secondary Market Class relied upon the misrepresentations by the act of purchasing Champignon's securities in an efficient

market that promptly incorporated into the price of those securities all publicly available material information regarding the Company's securities. As a result, the misrepresentations caused the price of Champignon's securities to trade at artificially inflated prices during the Class Period, thus directly resulting in damage to the Plaintiff and the other members of the Secondary Market Class when the misrepresentations were publicly corrected.

18.    Champignon is liable for the loss and damage suffered by the members of the Secondary Market Class.

**Statutory Primary Market Liability**

19.    On behalf of the Primary Market Class, the Plaintiff asserts the cause of action under section 132.1 of the *Securities Act* (and, if necessary, the equivalent provisions of the Other Canadian Securities Legislation) against Champignon and the Underwriters for damages pertaining to a misrepresentation in a prescribed disclosure document.

20.    The investor presentation dated May 2020 was the offering memorandum pursuant to which Champignon's Private Placement was conducted. The securities sold in the Private Placement were offered by the May 2020 investor presentation. The investor presentation is hence a prescribed disclosure document within the meaning of section 132.1 of the *Securities Act* (and, if necessary, the equivalent provisions of the Other Canadian Securities Legislation).

21.    Champignon was the issuer whose securities were offered by the investor presentation.

Ex. V, at 43

22. The Underwriters all consented to the disclosure of information in the investor presentation and/or signed the investor presentation.

23. The investor presentation contained misrepresentations by *inter alia,* omitting to disclose that Lucas Birdsall was a paid consultant and related party who exerted significant influence over Champignon and that the Company's four Acquisitions completed only weeks prior were all of companies that were owned by this undisclosed related party. The investor presentation also contained misrepresentations by omitting to disclose the true value of the Acquired Companies (which were later revealed to have no revenues and far fewer assets than represented) and by omitting to disclose that in the case of all 4 Acquisitions, there existed a material uncertainty that may cast significant doubt on the Acquired Company's ability to continue as a going concern.

24. Champignon and the Underwriters are liable to the Primary Market Class for the misrepresentations contained in the May 2020 investor presentation, as particularized herein.

**Common Law Primary Market Liability (Negligent Misrepresentation)**

25. On behalf of the Primary Market Class, the Plaintiff pleads negligent misrepresentation against Champignon and the Underwriters for conducting the Private Placement on the basis of the misrepresentations.

26. In the leadup to the Private Placement, an investor presentation dated May 2020 was disseminated to prospective primary market investors which contained misrepresentations as outlined above. Further, the financial statements and MD&A containing misrepresentations about *inter alia* the true value of the Company's assets and net loss

were released on May 29, 2020 (just weeks prior to the Private Placement) and were not corrected prior to the Private Placement being conducted (which is itself a misrepresentation by omission).

27.    The Private Placement was conducted pursuant to these misrepresentations and omissions for the purpose of inducing members of the Primary Market Class to participate in the Private Placement and buy Champignon's securities (i.e., common shares and warrants).

28.    Champignon and the Underwriters undertook, at all material times, to prepare and disseminate the May 2020 investor presentation with reasonable care for the aforementioned purpose. Champignon and the Underwriters intended and were aware that the members of the Primary Market Class would rely reasonably and to their detriment on the investor presentation and Champignon's most recently released financial statements and MD&A in making the decision to purchase Champignon's securities in the Private Placement.

29.    Champignon and the Underwriters further knew and intended that the information contained in the investor presentation and (ultimately restated) financial statements and MD&A would be incorporated into the price of Champignon's publicly traded securities such that the offering price of the securities offered under the Private Placement would at all times reflect the information contained in those documents and which existed in the public domain at that time about Champignon.

30.    Champignon and the Underwriters had responsibility for the preparation of the investor presentation and undertook to do so for the benefit of, and to be relied upon by, the members of the Primary Market Class.

Ex. V, at 45

31.   Champignon and the Underwriters therefore had a duty of care at common law to exercise due care and diligence to ensure that the investor presentation and other information given to investors in the leadup to the Private Placement fairly and accurately disclosed all material information about Champignon.

32.   Champignon and the Underwriters breached that duty by failing to take reasonable (or any) steps to ensure that the investor presentation, financial statements and MD&A did not contain the misrepresentations and omissions particularized herein.

33.   In the leadup to the Private Placement, Champignon and the Underwriters had exclusive access to the true information about Champignon's business and operations, including the Acquisitions. As such, Champignon and the Underwriters were the primary source of information with respect to Champignon's business and operations for participants of the Private Placement.

34.   The members of the Primary Market Class directly or indirectly relied upon the misrepresentations and omissions in making a decision to purchase Champignon's securities, and suffered damage when the misrepresentations were publicly corrected.

35.   Alternatively, the members of the Primary Market Class relied upon the misrepresentations by the act of purchasing Champignon's securities in an efficient market that had incorporated into the offering price of the securities offered under the Private Placement all publicly available material information regarding the Company's securities. As a result, the misrepresentations caused the Private Placement to be conducted at an artificially inflated price, thus directly resulting in damage to the

members of the Primary Market Class when the misrepresentations were publicly corrected.

36.    Champignon and the Underwriters are jointly and severally liable for the loss and damage suffered by the members of the Primary Market Class.

**Vicarious Liability**

37.    Champignon is vicariously liable for the acts and omissions of the Individual Defendants particularized herein.

38.    The acts or omissions particularized and alleged herein to have been done by Champignon were authorized, ordered and done by the Individual Defendants and other agents, employees and representatives of Champignon, while engaged in the management, direction, control and transaction of the business and affairs of Champignon.

39.    By virtue of the relationship between Champignon and Individual Defendants, such acts and omissions are, therefore, not only the acts and omissions of the Individual Defendants, but are also the acts and omissions of Champignon.

40.    At all material times, the Individual Defendants were directors and/or officers and/or consultants of Champignon. As their acts and omissions are independently tortious, they are personally liable for same to the Plaintiff and the other Class Members.

**Jurisdiction *Simpliciter***

41.    There is a real and substantial connection between British Columbia and the facts alleged in this proceeding. The Plaintiff and the other Class Members plead and rely upon the

Ex. V, at 47

*Court Jurisdiction and Proceedings Transfer Act* in respect of the Defendants. Without limiting the foregoing, a real and substantial between British Columbia and the facts alleged in this proceeding exists pursuant to section 10(f) to (h) of the *Court Jurisdiction and Proceedings Transfer Act* because this proceeding concerns

    a.   restitutionary obligations that, to a substantial extent, arose in British Columbia;

    b.   a tort committed in British Columbia; and

    c.   a business carried on in British Columbia.

| | |
|---|---|
| Plaintiff's address for service: | **KND Complex Litigation**<br>c/o Eli Karp / Hadi Davarinia<br>1186 Eglinton Avenue West<br>Toronto, ON.  M6C 2E3 |
| Place of trial: | Vancouver, British Columbia |
| The address of the registry is: | 800 Smithe Street, Vancouver, BC.  V6Z 2E1 |
| April 19, 2021 | |

_____
Signature of Lawyer for the Plaintiff
**Eli Karp**

Rule 7-1(1) of the Supreme Court Civil Rules states:

(1)    Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

    (a)   prepare a list of documents in Form 22 that lists:

        (i)   all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

        (ii)   all other documents to which the party intends to refer at trial, and

    (b)   serve the list on all parties of record.

Ex. V, at 48

**ENDORSEMENT ON ORIGINATING PLEADING OR PETITION FOR SERVICE OUTSIDE BRITISH COLUMBIA**

The Plaintiff, Jefferey Liu, claims the right to serve this pleading on the Defendants outside British Columbia on the ground that there is a real and substantial connection between British Columbia and the facts alleged in this proceeding and the Plaintiff and other Class Members plead and rely upon the *Court Jurisdiction and Proceedings Transfer Act* in respect of the Defendants. Without limiting the foregoing, a real and substantial connection between British Columbia and the facts alleged in this proceeding exists pursuant to section 10(f) to (h) of the *Court Jurisdiction and Proceedings Transfer Act* because this proceeding:

> (f)    concerns restitutionary obligations that, to a substantial extent, arose in British Columbia;
>
> (g)    concerns a tort committed in British Columbia; and
>
> (h)    concerns a business carried on in British Columbia.

**APPENDIX**

[*The following information is provided for data collection purposes only and is of no legal effect.*]

**Part 1: CONCISE SUMMARY OF NATURE OF CLAIM:**
This is a claim for damages at common law and under statute arising out of misrepresentations and failure to make timely disclosure in disclosure documents released by the corporate defendant.

Ex. V, at 49

**Part 2: THIS CLAIM ARISES FROM THE FOLLOWING:**

A personal injury arising out of:

      [ ] a motor vehicle accident;

      [ ] medical malpractice

      [ ] another cause

A dispute concerning:

      [ ]  contaminated sites

      [ ] construction defects

      [ ] real property (real estate)

      [ ] personal property

      [ ] the provision of goods or services or other general commercial matters

      [x] investment losses

      [ ] the lending of money

      [ ] an employment relationship

      [ ] a will or other issues concerning the probate of an estate

      [x] a matter not listed here

**Part 3: THIS CLAIM INVOLVES:**

      [x] a class action

      [ ] maritime law

      [ ] aboriginal law

      [ ] constitutional law

      [ ] conflict of laws

      [ ] none of the above

      [ ] do not know

**Part 4: ENACTMENTS RELIED ON:**

All as amended:

1. *Class Proceedings Act*, RSBC 1996, c 50;

2. *Securities Act,* RSBC 1996, c 418 and, if necessary, the Other Securities Acts;

3. *Court Jurisdiction and Proceedings Transfer Act*, SBC 2003, c 28; and

4. *Court Order Interest Act*, RSBC 1996 c 79 as amended.

Ex. V, at 50