# EXHIBIT 1

Robert V. Prongay (SBN 270796)
Casey E. Sadler (SBN 274241)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: csadler@glancylaw.com

*Counsel for Lead Plaintiff Michael G.*
*Quinn and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY N. SCHNEIDER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHAMPIGNON BRANDS INC., GARETH BIRDSALL, and MATTHEW FISH, <br><br> Defendants. | Case No. 2:21-cv-03120-JVS-KES <br><br> **DECLARATION OF MICHAEL A. MAREK IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR (I) PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, (II) CERTIFICATION OF THE SETTLEMENT CLASS, AND (III) APPROVAL OF NOTICE TO THE SETTLEMENT CLASS** <br><br> Date: <br> Time: <br> Crtm:    10C <br> Judge:   James V. Selna |

I, Michael A. Marek, declare as follows:

1.    I submit this declaration in support of Lead Plaintiff's Unopposed Motion for (1) Preliminary Approval of Class Action Settlement, (II) Certification of the Settlement Class, and (III) Approval of Notice to the Settlement Class (ECF No. 63) and in accordance with the Court's August 15, 2022 Order (ECF No. 71).  I have personal knowledge of the facts set forth herein and if called upon to testify thereon, I could and would do so truthfully and accurately.

2.    I am a founding member of Financial Markets Analysis, LLC ("FMA"), a securities analysis firm located in Newtown, Pennsylvania.  A summary of my employment background, experience, and qualifications is set forth in Exhibit A attached hereto.  I was retained by Lead Plaintiff to consult on matters in this litigation including the materiality of information allegedly misstated and/or omitted by Defendants, the causation of damages to members of the Settlement Class (as defined in the Stipulation and Agreement of Settlement (the "Stipulation, ECF No. 65-1)[1] and the quantification of those damages.  This declaration is submitted to describe my work in estimating aggregate damages available on a Class-wide basis.

3.    In preparing my analysis I reviewed:

A.    Daily price and trading volume data for Champignon Brands Inc. n/k/a Braxia Scientific Corp. ("Braxia" or the "Company") common shares before, during, and following the Settlement Class Period;

B.    Historical data for general equity market and pharmaceutical industry indices, including the Russell 3000 Index and the Russell 3000 Index Pharmaceuticals Subsector;

[1] Unless otherwise described, all capitalized terms have the meanings ascribed to them in the Stipulation.

1

C.    Filings made by Braxia with on the System for Electronic Document Analysis and Retrieval ("SEDAR") during and after the Settlement Class Period, including the Initial Public Offering Prospectus, Business Acquisition Reports, Listing Statements, Financial Statements, Management Discussion & Analysis and Early Warning Reports;

D.    Press releases issued by Braxia before, during, and after the Settlement Class Period;

E.    News articles about Braxia published in the general, financial and industry press before, during, and after the Settlement Class Period; and

F.    Filings made in connection with this matter, including, the Complaint.

I.    EMPIRICAL "EVENT STUDY" METHODOLOGY

4.    Lead Plaintiff claims that during the Settlement Class Period (March 27, 2020 through February 17, 2021, inclusive), Braxia issued statements relating to the Company's pending and future acquisitions which were materially false and misleading because of the failure to disclose, and/or misrepresentation of, adverse facts including that: (1) the brother of the Company's then-CEO was a shareholder in each of the four acquired companies making him a related party to the transactions; (2) the Company lacked a legitimate basis to allocate much of the purchase price of these acquisitions to purported "intellectual property;" and (3) the Company's financial statements inaccurately accounted for the acquisitions.

5.    Under a reasonable reading of loss and/or damage causation related to Lead Plaintiff's allegations in this matter, the Company made two potentially relevant announcements that constituted disclosure of information alleged by Lead Plaintiff to have been previously misstated and/or omitted: (1) the June 22, 2020 announcement that the Company would be subject to a regulatory review surrounding the recent

acquisitions by the Company; and (2) the February 17, 2021 announcement that the Company had determined to withdraw and refile its condensed interim consolidated financial statements and management's discussion and analysis for the three and six month periods ended March 31, 2020 as a result of a review by the British Columbia Securities Commission.

6. To arrive at a reliable measure of artificial price inflation in a security, it is generally necessary to generate empirical, statistical evidence of the materiality of the statements and disclosures that relate to Lead Plaintiff's allegations. To estimate the financial effects of these statements and disclosures, both defendants' and plaintiffs' damages experts often employ a generally accepted methodology commonly referred to as an "event study" (or "market model"). This is an empirical technique that is that is supported by published literature, employs procedures based on objective standards, and has a known rate of error. It is a standard research method that provides a statistical measure of whether a particular "event" or disclosure caused a significant change in the total mix of information that determines the price of a security.

7. Generally, the first step of an "event study" involved identification of the events of interest and the definition of the event window. In this matter, I first retrieved and reviewed databases of publicly available information regarding Braxia. These events included disclosures made directly by Braxia as well as other Company-specific events including media coverage. I used a one-day window to measure significance. For example, if the Company issued a press release during or before market hours (*i.e.*, an event date), the relevant measurement was the difference between the previous trading date's closing price and the event date's closing price. If a press release or other information became available only after the close of trading, the next trading date was effectively the "effective news date."

8. The next step involved assessment of the Company's common share price sensitivity to market-wide and industry changes during the Settlement Class

Period in this matter. Simply put, this is the creation of a "market model" that quantifies the mathematical and statistical relationships between changes in the price of Braxia common shares and changes in the general stock market and/or stocks of companies whose primary business is related to that of the Company. I estimated various "market models" during the Settlement Class Period using different combinations of market and industry indices. I then compared these models' statistical properties and the extent to which they captured the effect of general market and industry forces on Braxia's common share price. I employed a model that included daily returns on the following independent variables: (1) the Russell 3000 Index; and (2) the Russell 3000 Index Pharmaceuticals Subsector.

9. Next, the event study involved prediction of a normal return during the event window (in the absence of the event) and estimation of the "residual" or "abnormal" return within the event window, which is defined as the difference between the actual and predicted returns. A market model such as the one that I employed in this matter is a generally accepted, widely used method to obtain estimates of abnormal returns. The approach of this methodology is to use the statistical method of linear regression to extract market-wide and industry effects from overall Company-specific effects of events, for example, the disclosure of information. I employed standard statistical tests to test for significant Company specific price changes (commonly referred to as "residuals") on a daily basis. Finally, statistical testing is performed in order to determine whether the abnormal return is statistically different from zero.

10. Using the regression equation described above, I calculated daily predicted and abnormal (residual) returns for Braxia common shares during the Settlement Class Period. For the purpose of estimating plaintiff damages in this matter, I included the abnormal returns of Braxia shares associated with corrective disclosure dates identified above, namely June 22, 2020 ($0.16 per share); and February 17, 2021 ($0.09 per share).

## II. AGGREGATE DAMAGES CALCULATION BASED ON EVENT STUDY AND "MULTI-TRADER" MODEL

11. I have been asked by Lead Counsel to express my opinion regarding the maximum total recoverable damages in this Action on an aggregate, Class-wide basis (as opposed to a per share basis).

12. Calculation of a gross damages figure requires the use of a trading model to estimate, *inter alia*, the number of common shares actually traded during the Settlement Class Period and, more particularly, in this case, those that traded during the following two inflationary sub-periods:

| Purchase Date Range | Estimated Artificial Inflation per Share | |
| --- | --- | --- |
| 03/27/2020 – 06/19/2020 | $0.25 | ($0.16 + $0.09) |
| 06/22/2020 – 02/16/2021 | $0.09 | ($0.09) |

13. I estimated aggregate Settlement Class Member damages on a daily basis through the use of a "multi-trader" model. The model incorporates empirical and observable data regarding ownership and trading in Braxia common shares during the Settlement Class Period and ninety (90) days thereafter,[2] as well as parameters derived from published research. My model allowed me to reliably estimate damages suffered by Settlement Class Members through the estimation of the number of shares purchased on each trading date as well as the disposition of those shares.

14. Based upon empirical evidence, I divided Settlement Class Members into two trading categories. The first category encompasses high activity traders, who accounted for 20% of non-insider ownership and account for 80% of reported trading. The second category encompasses low activity traders, who accounted for 80% of

---

[2] In accordance with Sections 21(D)(e)(1) and 21(D)(e)(2) of the Private Securities Litigation Reform Act of 1995 ("PSLRA") which set forth certain limitations on damages (the "PSLRA 90-Day Lookback Period").

non-insider ownership and account for 20% of reported trading.[3]  Based on these parameters, high activity traders had a relative propensity to trade of 16.  That is, high activity traders were 16 times more likely to trade than low activity traders.  These parameters are consistent with publicly available research in this area.

15.    In the model, the number of shares held by potential Settlement Class Members as of the beginning of the Settlement Class Period was set equal to the number of total Braxia common shares outstanding as of the beginning of the Settlement Class Period less shares owned by Company insiders at that point in time. I made adjustments to this initial figure, commonly referred to as the "float", on a daily basis for potential additions/subtractions.  These adjustments were due to issuances of additional shares pursuant to secondary offerings and business acquisitions, insider trading activity, changes in the short interest position, warrant exercises and repurchases made by Braxia.

16.    Braxia common stock traded both in Canada (Canadian Securities Exchange ("CSE")) and in the United States (Over-the-Counter ("OTC").  For purposes of estimating damages to Settlement Class Members only, I made the simplifying assumption that the percent of float held in the United States was equal to approximately 46% of the total.  This was the same percentage as reported OTC trading volume compared to combined OTC and CSE reported trading volume during the Settlement Class Period.

---

[3] As is also customary in this type of model, I excluded estimated trading volume executed by a third category of traders, commonly known as high-frequency traders, (or day-traders).  Intra-day matched purchase and sale transactions would generally not result in a Recognized Loss under a Plan of Allocation such as the one in this matter.

6

17.     Using the above-detailed method, my analysis in this matter indicates that the total amount of damages shares is 53,716,176[4] and the estimated damages under §10(b) are $7,926,522.

**III.     SUMMARY AND CONCLUSION**

18.     Based on my analysis of the issues, including the quantification of damages in this matter, it is my opinion that the maximum aggregate amount of damages potentially availably in this Action equal $7,926,522.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 26th day of August 2022, at Newtown, Pennsylvania.

*Michael A. Marek*
_____
Michael A. Marek

---

[4] This is comprised of: (1) 32,245,111 shares estimated as purchased during the Settlement Class Period and still held as of the end of the PSLRA 90-Day Lookback Period ("Retained Shares"); plus (2) 21,471,065 shares purchased and sold at a Recognized Loss between the two Settlement Class sub-periods described above or during the PSLRA 90-Day Lookback Period.

7

# Exhibit A

**MICHAEL A. MAREK, CFA**
100 North State Street
Newtown, PA 18940
Phone:  (215) 968-4142          Fax:  (215) 968-4183
e-mail: mmarek@fmavalue.com

## Professional Experience

| | | |
|---|---|---|
| 05/01 – Present | **Financial Markets Analysis, LLC** | Princeton, NJ / Newtown, PA |
| 12/97 - 04/01 | **Triumph Partners, LLC** | Princeton, NJ |

Founding Member
Provide financial analysis, valuation services and expert litigation support and testimony.  Areas of concentration include valuation of securities and businesses, securities law and economic issues.  Testimonial experience in securities class action litigation.  Clients include corporations, government agencies (SEC), law firms, institutional and individual investors.

| | | |
|---|---|---|
| 10/86 - 12/97 | **Princeton Venture Research, Inc.** | Princeton, NJ |

Vice President
Performed securities valuation and financial analysis in connection with investment banking, venture capital and securities law expert consulting operations.  Prepared company and industry research reports, valuations and fairness opinions.  Responsible for project management and supervision of financial analysts and research personnel.

| | | |
|---|---|---|
| 05/85 - 06/86 | **Sage Data, Inc.** | Princeton, NJ |

Research Analyst
Developed and maintained econometric models and business forecasting systems for Fortune 500 clients.  Created, produced and instructed customized PC hardware and software application seminars.

## Education

| | |
|---|---|
| 1984 | **Wharton School of Finance, University of Pennsylvania** |

B.S. Economics
Double Major: Finance / Decision Sciences

## Professional Designations and Affiliations

Chartered Financial Analyst (CFA)
Member, New York Society of Security Analysts (NYSSA)
Member, CFA Institute